[Civil No. 3029. Filed November 9, 1931.]

[4 Pac. (2d) 673.]

CITY OF TUCSON, a Municipal Corporation, Appellant, v. CHAS. N. SIMS, C. I. SMITH, H. E. SCHWALEN, H. R. BATTERTON, L. C. YATES, HERMAN OVERFELD, MRS. FRED STEGER, MRS. MINNIE DICK, B. I. WILSON, C. E. BELL, F. E. BLOCK, C. E. LAWRENCE, W. J. SCHNAUFER, HELEN E. BARCLAY, JOHN BROCKMAN, NELS WHITESTONE, W. E. FLETCHER, MRS. LINA NEWMAN, WM. WALLACE, EARL CHAMBERLAIN, C. C. YEAZILL, C. F. WHEELER, C. L. SWINNEY, H. E. PRISER, H. H. PRISER and REX CATT, Appellees.

Mr. Ben C. Hill, City Attorney, for Appellant.

Mr. Milton M. Cohan, for Appellees.

McALISTER, C. J.—In this action, certain residents of Menlo Park subdivision, adjacent to the city of Tucson, sought to recover from the latter amounts they had been required to pay for domestic water in excess of the sums paid by those living within the corporate limits of the city, and from a judgment in their favor the city appeals.

The Pima Realty Company, it appears from the record, owned Menlo Park subdivision, a tract of land just outside the western boundary of the city of Tucson which had been divided into lots and blocks and whose streets and alleys had been dedicated to the public. In 1914 the company desired to install in the streets and alleys of this subdivision a water distributing system for the benefit of it and those residing thereon, and to carry out this purpose it proposed to the city that it be allowed to purchase water therefrom. These negotiations resulted in a contract between it and the city of Tucson in June of that year by which the latter agreed to extend the necessary water-main to its western boundary line and permit the company to connect its water distributing system therewith at that point and thereafter to receive water from the city under the conditions set forth therein. By the terms of this agreement the entire distributing system to be installed by the company was to pass under the control and management of the city as soon as the water was turned into it and thenceforth was to remain under such control as fully as though it belonged to the city. The contract provided further that ''the said system shall be under and subject to the same rules and regulations as now or hereafter prescribed for 'the city's water system and consumers of water therefrom and the same rates for water shall be charged and received.''

Pursuant to this agreement the city furnished water to this subdivision up to March, 1926, when by ordinance it required the residents thereof to pay a water charge fifty per cent. in excess of that the residents of the city were compelled to pay and has since that time collected this excess charge. Plaintiffs allege that neither they nor the original parties to the contract consented to this change in the agree-

ment, that the excess charge is unlawful and that they paid it under protest. They asked for an accounting of the excess amounts they had paid the city for water, that they have judgment against the city for such amounts and that it be restrained from collecting them in the future.

The answer was a general denial and following a hearing the court rendered judgment that the city make an accounting of the excess water charges collected by it from the plaintiffs up to May 12, 1927, the date on which Menlo Park subdivision became a part of the city, and that it pay each plaintiff the sum such accounting showed to be due him. It was from this judgment the city appeals.

Several errors are assigned but they raise only two questions, the first of which deals with the meaning of the contract, the contention of appellant being that it is plain and unambiguous in its terms and does not require the city to furnish water to the residents of Menlo Park at the same rates it charges those residing in the city. It was upon this theory that the mayor and city council acted in 1926 when, after deciding that it was necessary to equalize the rates between the consumers inside and those outside the city and that, due to the fact that those living within the corporate limits paid city taxes while those living beyond them did not, an equal footing between these two classes in the matter of rates would be established if the latter were required to pay fifty per cent. more for water than the former, they passed an ordinance to effectuate this result and in it made no exception of the residents of Menlo Park but compelled them along with other outsiders, notwithstanding the contract, to pay the additional fifty per cent.

It is clear to us from the language of the contract that the Pima Realty Company and the city both in-

tended that during the life of the agreement the residents of Menlo Park would be charged the same rates for domestic water that consumers in the city were charged. The provision that the distributing "system shall be under and subject to the same rules and regulations as now or hereafter prescribed for the city's water system and consumers of water therefrom and the same rates for water shall be charged and received" could have no other meaning. While it is true, as contended by appellant, that this provision permits a change in the rules and regulations governing the water system as then existing, it does not, as appellant also argues, stop with this idea, but goes further and provides specifically that "the same rates for water shall be charged and received," and this statement, when considered in connection with the admitted purpose of the contract and the language used to express it, is reasonably susceptible of no other construction than that the city could charge the residents of Menlo Park and receive from them the same rates for water it collected from residents of the city and none other. It was not necessary, as appellant contends, that the words, "charged residents of the city," be used after the word, "rates," before this idea is conveyed.

However, to clear up any ambiguity that appellees felt might exist relative to the rates to be charged residents of Menlo Park the court over the objection of appellant permitted one Tom K. Richey, who, when the contract was agreed to as well as for some time before, was counsel for the Pima Realty Company and as such present at several meetings of the city council when the contract was discussed, to testify that it was understood by the parties that "the rates were to be the same as the rates charged its consumers here in the city," and this ruling is assigned as error. As we view it, there is no ambiguity in

the contract relative to the charges for water and, therefore, no occasion for an explanation of its terms, but the admission of the testimony was not prejudicial since it placed upon the agreement a meaning which varied in no degree from that clearly conveyed by its language and, hence, could not have been construed otherwise in the absence of the statement of the witness.

The fact that the agreement recognized the right of the city to change and regulate the rates whenever it saw fit did not, as contended by appellant, authorize it to place appellees on a different rate from that charged those residing within its limits, nor did the fact that the ordinance placed all outside residents in the same class relieve it from the duty of living up to this particular provision of the contract, that is, if the agreement were one within the power of the city to make in the first instance.

The second proposition advanced is that it was not a contract of this character, the claim of appellant being that the city had no power to agree to furnish water outside its limits and, therefore, the contract to do so is *ultra vires* and void. This proposition is based upon the view that while section 3, article 4, of the old City Charter of Tucson, which gives the mayor and common council the power "to construct wells, systems, aqueducts and conduits to supply the city with water or to purchase said supply," and section 5, article 13, Constitution of Arizona, providing that "every municipal corporation within this State shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said municipal corporation," confer upon the city of Tucson authority to furnish water to its own residents, they do not empower it to supply water to those outside its limits. It will be observed, however, that

neither of these provisions expressly prohibit it from doing so and in our view neither contains an implication to this effect, and this being true the fact that it may engage in the business of furnishing water to its own residents renders it immaterial under the circumstances whether the city has been specifically empowered by its charter or the statutes to furnish domestic water to outsiders.

This is true, first, because it is well settled that municipal corporations have two powers, one legislative or governmental and the other proprietary, and that in operating a water system or lighting plant it is not acting in its governmental but proprietary capacity, and acts performed by it pursuant to this power are by the great weight of authority largely measured by the rules governing private corporations. In the *City of Henderson* v. *Young,* 119 Ky. 224, 83 S. W. 583, the court says:

"In the exercise of these powers [proprietary] it is governed by the same rules that govern private individuals or corporations. See Dillon's Municipal Corporations, 3d ed., 36, and authorities cited in note. In the management and operation of its electric plant a city is not exercising its governmental or legislative powers, but its business powers, and may conduct it in the manner which promises the greatest benefit to the city and its inhabitants in the judgment of the city council; and it is not within the province of the court to interfere with the reasonable discretion of the council in such matters."

In *Milligan* v. *Miles City,* 51 Mont. 374, L. R. A. 1916C 395, 153 Pac. 276, the court uses this language:

"When a city is engaged in operating a municipal plant under an authority granted by the general law, it acts in a proprietary or business capacity. In this behalf it stands upon the same footing as a private individual or a business corporation similarly situated."

In *Sumid* v. *City of Prescott,* 27 Ariz. 111, 230 Pac. 1103, this court based its ruling, that a city is liable to an employee for injuries received while working on its water plant, upon the theory that the business in which it occurred (operating a water system for its inhabitants) was carried on by the city in the exercise of its proprietary as distinguished from its governmental power and that in consequence of this it was liable for such injuries to the same extent a private corporation would be under the same circumstances. Speaking through Mr. Justice ROSS the court uses this language:

"Under the common law a municipal corporation exercising proprietary or business powers was regarded *quoad hoc* a private corporation, and was liable to the same extent and on the same principles as a private corporation."

Then follow a number of citations in support of the proposition and from the last of these, *Keever* v. *City of Mankato,* 113 Minn. 55, Ann. Cas. 1912A 216, 33 L. R. A. (N. S.) 339, 129 N. W. 158 (775 of 129 N. W. on rehearing), the following excerpt was quoted with approval:

" 'When a municipality engages in a private enterprise for profit, it should have the same rights and be subject to the same liabilities as private corporations or individuals.' "

A further reason why the absence of specific charter or statutory authority does not prevent it from furnishing water to nonresidents follows as a corollary of the foregoing and that is that when a city engaged in operating a water system or lighting plant develops a surplus of water or electric current or a by-product of either, it may, as a mere incident of its right to furnish either, dispose of this surplus or by-product for the benefit of the city. In 19 R. C. L. 788, the rule is stated in the following language:

"When, however, as a necessary result of carrying on a legitimate public enterprise in a reasonably prudent manner a surplus of the material used or distributed is acquired, or a by-product created, a municipal corporation may lawfully engage in the business of disposing of such surplus or by-product for profit, without special legislative authority."

This is in line with the holding in *Orme* v. *Salt River Valley Water Users' Assn.,* 25 Ariz. 324, 217 Pac. 935, in which the right of that association to develop hydro-electric power for sale as a mere incident to its right to impound and discharge water for irrigation purposes was recognized. See *Milligan* v. *Miles City, supra; Pikes Peak Power Co.* v. *City of Colorado Springs,* 105 Fed. 1, 44 C. C. A. 333.

The situation presented by the facts of this case is such, we think, as to bring the city of Tucson within this rule. Before it could furnish its own residents with water it was necessary that it secure from some source a supply sufficient in quantity for this purpose and that it install a system for distributing it. The record, it is true, contains a stipulation that during the period covered by the contract the city did not have a surplus storage capacity, but this is unimportant in view of the fact that it did supply the residents of Menlo Park with water for eleven or twelve years before increasing the rate, something that could not have been done unless it had had at its source of supply more water than it needed for its own citizens. And it must likewise be true that its distributing system was built to meet the needs of a growing population and was, therefore, at that time capable of carrying water to a greater number of people than lived within its boundaries, because there is no showing that it was enlarged or added to in any way for this purpose other than the laying of a pipe-line from its sixteen-inch water-main to its westerly boundary line to connect with the one put

in by the residents of Menlo Park subdivision. Since, therefore, the city of Tucson, as a result of placing itself in a position to serve its own users found itself in ownership and control of a surplus of domestic water which could with little if any additional cost be supplied to those outside its limits and its income thereby increased, and since no provision of its charter or of the statute stood in the way of its doing so, its decision to follow the dictates of common business prudence was clearly within its power.

Section 5, article 13, of the Constitution, quoted above, which appellant suggests may constitute a limitation upon the city's right to furnish water to people living beyond its boundaries since the city cannot grant a franchise to that effect, was not, as we view it, intended as such any more than was the charter provision conferring the power "to construct wells, cisterns, aqueducts and conduits to supply the city with water or purchase said supply." Both provisions confer upon cities the right to do a specific thing but do not in terms or by necessary implication limit or prohibit them from doing something advantageous to themselves that is merely incidental to the thing specially authorized. Nothing short of an express prohibition or clear implication to that effect could have this result.

The judgment of the lower court is affirmed.

ROSS and LOCKWOOD, JJ., concur.