497 P.2d 55

**CITIZENS UTILITIES WATER COMPANY**
of Arizona, an Arizona corporation,
Petitioner,

v.

**The SUPERIOR COURT of the State of
Arizona IN AND FOR the COUNTY
OF PIMA et al., Respondents.**

No. 10726.

Supreme Court of Arizona,
In Banc.

May 12, 1972.

Rehearing Denied June 13, 1972.

Evans, Kitchel & Jenckes by Lex J. Smith and Earl Carroll, Phoenix, for petitioner.

Herbert E. Williams, City Atty., by Richard H. Day, Asst. City Atty., Chandler, Tullar, Udall & Richmond by Thomas Chandler, Rose Silver, Pima County Atty., Tucson, for respondents.

HAYS, Chief Justice.

Petitioner in this court, Citizens Utilities Water Company, hereinafter referred to as "Citizens" or "the company," was the defendant below, in an action by the City of Tucson to condemn all of the company's properties in Pima County. Respondent, City of Tucson, was the plaintiff below and is the real party in interest in this court.

The complaint alleged that an election was held, in which the citizens of Tucson approved condemnation of additional water facilities, and that pursuant thereto the city council passed a resolution authorizing and directing the condemnation of all of Citizens' property in Pima County "used and useful in rendering water utility service." The city's complaint prayed for a decree of condemnation of all of Citizens' property in the county, including its certificates of convenience and necessity.

The record shows that the company's certificates of convenience and necessity permit it to serve a number of non-contiguous areas totalling 640,000 acres in Pima County, with varying population densities. Some of the areas are several miles from the city limits; some of them are inside. Some are outside the limits but serve residents of the city; others are outside but are connected to facilities that serve city residents; still others are outside the city limits, unconnected to any city facilities and do not serve any city residents. Many of the certificated areas are partially or wholly undeveloped. The company admits the city's right to condemn those properties which are located inside the city, are connected to city facilities, or serve city residents. This controversy is over the question of the city's right to condemn those properties which are outside the city, unconnected with the city, and not used to serve Tucson citizens.

The parties agreed that the trial would be bifurcated, and that the first part would take place before the court sitting without a jury. It would try only the issue of the city's right to condemn those properties which lay outside the city limits, were not connected to the city's water system, and did not serve any resident of the city. The second part would be tried to a jury on the sole issue of damages arising from the taking.

The trial court held that the city could take *all* of the company's properties. The company, by this special action, sought and obtained a stay from this court and a review of the trial court's holding.

In examining the Arizona Constitution, A.R.S., one finds that the exercise of the right of eminent domain is circumscribed by Article 2, Section 17, which reads as follows:

"Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public."

Absent a violation of the United States Constitution, the above paragraph is the *only* limitation on the power of the State of Arizona to condemn private property.

Municipal corporations, on the other hand, are creatures of the State and have only such powers as the State sees fit to delegate to them, plus any which are granted to them by the State Constitution. Arizona Constitution, Article 2, Section 34, grants to the State, and to all municipal corporations in the State, the right to engage in "industrial pursuits." Arizona Constitution, Article 13, Section 5, provides that every municipal corporation in the State may engage in any business or enterprise which it can franchise private individuals or corporations to engage in.

The power of eminent domain has been granted by the State to the City of Tucson by means of several statutes and by means of the City's charter. A.R.S. § 9–511 grants cities the power to exercise the right of eminent domain *within or without the city limits* to acquire and build water works, pipe lines, and sites therefor. Section 9–516 authorizes cities to exercise the

right of eminent domain to acquire the facilities of any public service corporation, and requires that the city refrain from servicing the same area until it has acquired the utility. Section 12–1111 permits cities to exercise the right of eminent domain to obtain buildings, pipe lines, canals, and reservoirs.

Section 12–1112 provides that before property may be taken, it must appear that the taking is necessary and, if the property is already appropriated to some public use, that the public use to which it is to be applied is a "more necessary" public use.

Article IV, Section 1, of the Tucson City Charter, adopted by a vote of its residents, and approved by the governor of the State of Arizona, contains the following provisions:

"The city shall have the power . . .

"To acquire . . . by condemnation . . . works and appliances within and without the city for supplying the city and its inhabitants, also persons, firms, and corporations, with water.

.     .     .     .     .     .

"To sell within or without the city, water . . .

"To exercise the right of eminent domain for the purpose of acquiring real and personal property of every kind, including water, water rights, and waterworks, within and without the corporate limits, necessary or convenient for the use of the city or its inhabitants."

Despite this imposing array of authority to condemn property outside the city's limits, the company contends that the condemnation violates the constitutional mandate that the contemplated use be public, and violates the statutory mandate that the taking be necessary.

The company argues somewhat as follows: A city cannot be compelled to supply water to persons living outside of its corporate limits, but may supply such persons if it desires to do so. If it does, it may do so only with surplus water, and as soon as water has to be limited, it may cut off

service to nonresidents. Since nonresidents are not entitled to water as a matter of right, the city's action in supplying water to them is not a public use, but is rather a private use. In Citizens' own language:

"If members of the public (namely all non-city residents) do not as a matter of right have the ability to enjoy or use the property which is condemned, how can it be said that the taking of petitioner's properties is for a public use?"

As authority for this position, Citizens cite City of Phoenix v. Kasun, 54 Ariz. 470, 97 P.2d 210. All that case actually holds is that when a city furnishes water to nonresidents, the Arizona State Corporation Commission cannot regulate the rates charged.

In *Kasun, supra,* we said that a city which furnished water to nonresidents is acting in a private capacity rather than in its governmental capacity; that such recipients of water had no positive right to demand it and could be cut off from water if the supply became short for the city's residents. *But merely because the city is acting in its private capacity does not mean that the water is not being used for a public purpose.*

We can conceive of many situations in which a city condemns property outside the city limits: for an airport, a sanitary landfill, etc. Certainly all of the people are not as a matter of right entitled to demand permission to use the condemned premises. *The untrammeled right to use the property to be condemned, then, is clearly not the criterion of whether the use to be made is a public one.*

Nichols on Eminent Domain contains the following on "public use":

"Judicial opinion which follows [the] broad concept considers that the narrow doctrine has been repudiated and is no longer the prevailing view. 'Public use' is considered 'public benefit' and it is not considered essential that the entire community or even any considerable portion thereof should directly enjoy or partici-

pate in any improvement in order that it constitute a public use." Vol. 2A, pp. 7–30.

While we might not go so far as some of the jurisdictions embracing the broad view, we believe that we repudiated the narrow view as early as 1891 in Oury v. Goodwin, 3 Ariz. 255, 26 P. 376, in which we stated that the determination of what a public use was, would be determined on a case-by-case method. In that case we said:

"In a great number of these instances there is no participation by the general public, and the public use consists in the purely incidental benefits." p. 272, 26 P. p. 382.

Citizens cite Inspiration Consolidated Copper Company v. New Keystone Copper Company, 16 Ariz. 257, 114 P. 277, as an indication that Arizona follows the narrow view. However, that case merely illustrates what we said in Oury, supra—namely, that each case will be considered on its own facts. Oury has been cited with approval by us as late as 1965 in City of Phoenix v. Civic Auditorium and Convention Center, 99 Ariz. 270, 408 P.2d 818, in which we quoted the following from Oury, supra:

" 'Public necessity' often means . . . public convenience and advantage."

In City of Phoenix, supra, we quoted with approval the following:

"It is not a valid objection to the exercise of such powers, that one class of the inhabitants would receive more benefit than another. The test is whether the power, if exercised, will promote the general objects and purposes of the municipality. . . ."

In City of Tucson v. Sims, 39 Ariz. 168, 4 P.2d 673, we said:

"Both provisions confer upon cities the right to do a specific thing but do not in terms or by necessary implication limit or prohibit them from doing something advantageous to themselves that is merely incidental to the thing specially autho-

rized. Nothing short of an express prohibition or clear implication to that effect could have this result."

For all of the reasons expressed above, the cases cited by Citizens from other jurisdictions, though pertinent and opposed to our view, need not be cited here.

■ We hold that the action by the City of Tucson to condemn the property of Citizens is a taking for public use, as that term is used in the Arizona Constitution.

Citizens, however, contends that even if this is true, the taking of the properties outside the city that do not serve Tucson citizens, is not "necessary" as required by the statutes and charter. The city takes the position that the determination of necessity is a legislative decision of the city council which may not be reviewed by the courts, absent fraud or arbitrariness.

■ Since we have ample Arizona cases to determine this issue, there is no need to discuss the cases in other jurisdictions cited by Citizens. The issue was decided in Mosher v. City of Phoenix, 39 Ariz. 470, 7 P.2d 622, where we held:

"Evidence [was objected to] upon the question of whether or not the amount of land proposed to be taken was necessary for the widening of the street. The court, in our opinion, properly held that this was concluded by the legislative body of the city declaring the necessity." p. 482, 7 P.2d p. 626.

We find an absence of arbitrariness on the part of the city here.

At the trial, the Tucson City Manager testified as to the desirability of condemning all of Citizens' properties. His reasons appear in the transcript as an offer of proof, because the trial court refused to admit them. The reasons are material and, even though not admitted in evidence, they are the bases of very powerful arguments for permitting all of the properties to be condemned. For that reason, we list some of them here:

It is desirable that the city have a "metropolitan concept" of the supply and con-

trol of water; particularly, as the source of supply within the metropolitan area is not unlimited.

It is desirable to "beef up" the fire protection by having an integrated water system throughout the area.

It is desirable to have control of construction and expense, of utility facilities in the areas of potential growth.

It is desirable to hook up the company's facilities with the city's so as to equalize supply and demand in different areas.

It is desirable because the natural future growth of the city will eventually require all of Citizens' properties. If condemnation takes place piecemeal, there will be repeated severance damages, court costs and legal fees.

That the city may anticipate its growth, may be seen from the following language in City of Tucson v. Sims, 39 Ariz. 168, 4 P.2d 673:

"Before it could furnish its own residents with water it was necessary that it secure from some source a supply sufficient in quantity for this purpose and that it install a system for distributing it. . . . Its distributing system was built to meet the needs of a growing population and was, therefore, at that time capable of carrying water to a greater number of people than lived within its boundaries. . . . The city of Tucson, as a result of placing itself in a position to serve its own users found itself in ownership and control of a surplus of domestic water which could with little if any additional cost be supplied to those outside its limits and its income thereby increased." Pp. 176–177, 4 P.2d p. 675.

Lastly, we hold that the statute requiring that the public use of the property to be condemned, be "more necessary" than the present public use, is inapplicable to the instant case. This issue was decided in Desert Waters, Inc. v. Superior Court, 91 Ariz. 163, 370 P.2d 652, where a water company attempted to prohibit the city of Tucson from proceeding with its condemnation suit. In that case we said:

"Section 12–1112 sets forth prerequisites which must be shown before the power of eminent domain may be exercised under the general eminent domain statutes. Where the exercise of eminent domain powers is authorized under a specific statute which has been complied with, it is not necessary to comply with the general statute." p. 171, 370 P.2d p. 657.

The stay order previously issued herein is vacated, the judgment of the trial court is affirmed, and the case is remanded to the trial court for the purpose of ascertaining the damages suffered by Citizens due to the taking of its property.

CAMERON, V. C. J., and STRUCK-MEYER, LOCKWOOD and HOLOHAN, JJ., concur.