Fuchsberg, J.
We are here confronted with the question of whether a taking of land by the City of Yonkers, through its Community Development Agency, is for a sufficiently public purpose to be permissible under the requirements of our Federal and State Constitutions* and under applicable State and Federal law.
This action arises out of the agency’s formal request for a condemnation order, pursuant to our section 4 of the Condemnation Law. Defendants are tenants and landowners, both business and residential, in the area selected for redevelopment.
Both parties are before us on their pleadings and supporting papers. According to the complaint, the proposed taking of the land proceeded under the umbrella of a plan developed in accordance with State and Federal urban renewal legislation for the removal of "substandard” conditions. The defendants’ answers deny that the land is substandard and charge that it is to be taken, cleared and provided for a private purpose, that is, the expansion of the current plant facilities of the Otis *481 Elevator Company, a leading industrial employer in the City of Yonkers.
The issue to be resolved is, therefore, whether defendants are entitled to a trial to determine whether the taking here serves a dominantly public purpose. There is, of course, no question but that defendants are entitled to receive payment for the full value of their properties; the question is whether they have to part with them.
The Supreme Court found that there were no issues of fact which required a trial, holding, on the basis of our decision in Kaskel v Impellitteri (306 NY 73), that defendants would be required to present evidence sufficient to sustain a charge of fraud in order to prevent the issuance of the condemnation order to the plaintiff agency. The Appellate Division upheld the judgment entered on that decision (45 AD2d 889). The order should be affirmed.
The purpose of the. Federal program, under which the plan here qualified for approved, is to aid cities in the clearance of blighted areas and in their redevelopment. Two thirds of the difference between the cost of acquiring the land through payment to its owners of fair market value and that ultimately paid by the sponsor, here Otis, is reimbursed to the city by the Federal Government. The city itself pays the remaining one third of the cost differential.
Historically, urban renewal began as an effort to remove "substandard and insanitary” conditions which threatened the health and welfare of the public, in other words "slums” (see NY Const, art XVIII, § 1), whose eradication was in itself found to constitute a public purpose for which the condemnation powers of government might constitutionally be employed. Gradually, as the complexities of urban conditions became better understood, it has become clear that the areas eligible for such renewal are not limited to "slums” as that term was formerly applied, and that, among other things, economic underdevelopment and stagnation are also threats to the public sufficient to make their removal cognizable as a public purpose. (See Cannata v City of New York, 11 NY2d 210; Matter of Murray v La Guardia, 291 NY 320; Kaskel v Impellitteri, 306 NY 73, supra; Levin v Township Committee of Twp. of Bridgewater, 57 NJ 506; Schenck v City of Pittsburgh, 364 Pa 31; Berman v Parker, 348 US 26, 32; and see, generally, Bosselman, Alternatives to Urban Sprawl: Legal Guidelines for Governmental Action, Research Report No. 15 *482 to the National Commission on Urban Problems, Wash, DC, 1968, for the historical development of these concepts of urban renewal.)
Where, then, land is found to be substandard, its taking for urban renewal is for a public purpose, just as it would be if it were taken for a public park, public school or public street. The fact that the vehicle for renewed use of the land, once it is taken, may be a private agency does not in and of itself change the permissable nature of the taking of the substandard property. Of course, if property has not been determined to be substandard in an urban renewal context, it may not be taken in eminent domain unless it is proved that its taking was for another public purpose and, if there was also a private benefit involved, that the public purpose was dominant.
Therefore, if we assume that the land here involved was substandard, as found by the Yonkers City Council and its Planning Board, it would be no defense to its condemnation that Otis openly expressed a desire to acquire it to assure its own continued economic viability in Yonkers. It would not then be necessary, as a precondition to the taking, to determine that the public benefit in assuring the retention of Otis as an increased source of employment opportunity in Yonkers was sufficient to outweigh the benefit that may be conferred on Otis.
Nor does it undercut the public purpose of the condemnation of the substandard land that Otis’ motives are to serve its own interests. There is nothing malevolent about that. Most sponsors, where urban renewal involves industrial revival, are, as may be expected in our private enterprise economy, nonpublic and, at least in large part, profit-motivated. Indeed, that may even be desirable, since, unless there is such a reliable projection of profitability, the soundness and stability of the sponsor’s project may come into question. For the same reasons, the fact that the council’s public hearings were held after the selection of Otis as sponsor rather than beforehand, or that the city openly and admittedly signed an agreement with Otis before the condemnation of the land, under the circumstances here, and especially in the light of Otis’ ongoing economic importance to the community, must, at most, be regarded as mere irregularities cured by the fact that the hearings were actually held. It is also worth noting that, though presented with the opportunity for disapproval, the bipartisan city council was unanimous in its vote for approval.
*483 For the same reasons and on the same assumption that the area involved was substandard, it would be no defense that Otis had indicated it would leave Yonkers if suitable land was not found for its needed modernization and expansion, or that the condemned land was adjacent to Otis’ existing facilities, or that the two sites it had earlier rejected, as either uneconomical or unsuitable, were not substandard. There is nothing inherently wrong in serving both the city’s need for renewal of its substandard land and its desire to keep Otis in Yonkers at one and the same time. Nor is it remarkable that Otis would get the condemned land for a price which is but a fraction of that paid to the defendants and the other owners in condemnation. The very purpose of urban renewal subsidies is to attract new or existing sponsors to undertake the land clearing, the construction and other commitments the community desires of them, where the cost of acquiring the land privately, on a piece by piece basis, would be sufficiently expensive or difficult to deter private entities. (See 64th St. Residences v City of New York, 4 NY2d 268.)
We turn now to the subordinated issue in this case: Was the land to be condemned shown to be substandard?
As already indicated, on that question the agency’s road is made easier by the liberal rather than literal definition of a "blighted” area now universally indorsed by case law. Many factors and interrelationships of factors may be significant. These may include such diverse matters as irregularity of the plots, inadequacy of the streets, diversity of land ownership making assemblage of property difficult, imcompatibility of the existing mixture of residential and industrial property, overcrowding, the incidénce of crime, lack of sanitation, the drain an area makes on municipal services, fire hazards, traffic congestion, and pollution. It can encompass areas in the process of deterioration or threatened with it as well as ones already rendered useless, prevention being an important purpose. It is "something more than deteriorated structures. It involves improper land use. Therefore its causes, originating many years ago, include not only outmoded and deteriorated structures, but unwise planning and zoning, poor regulatory code provisions, and inadequate provisions for the flow of traffic.” (Cook, Battle Against Blight, 43 Marquette L Rev 444, 445.) For, the public safety, public health and public welfare, all legitimate objects of the police power, are broad and inclusive. (Berman v Parker, 348 US 26, supra.) And it may *484 even include vacant land (Cannata v City of New York, 11 NY2d 210, supra) and air rights (Jersey City Chapter of Prop. Owner’s Protective Assn. v City Council of Jersey City, 55 NJ 86).
Nor is it necessary that the degree of deterioration or precise percentage of obsolescence or mathematical measurement of other factors be arrived at with precision, since the combination and effects of such things are highly variable. (City of Chicago v Zwick Co., 27 Ill 2d 128.) These matters call for the exercise of a considerable degree of practical judgment, common sense and sound discretion.
Moreover, extensive authority to make the initial determination that an area qualifies for renewal as "blighted” has been vested in the agencies and the municipalities; courts may review their findings only upon a limited basis. (See Kaskel v Impellitteri, 306 NY 73, supra; Matter of Murray v La Guardia, 291 NY 320, supra; Denihan Enterprises v O’Dwyer, 302 NY 451; Cannata v City of New York, 11 NY2d 210, supra; What Constitutes "Blighted Area” Within Urban Renewal and Redevelopment Statutes, Ann., 45 ALR3d 1096-1137 and cases cited therein; Marquis, Constitutional and Statutory Authority to Condemn, 43 Iowa L Rev 170; Babcock v Community Redevelopment Agency, 148 Cal App 2d 38; Worcester Knitting Realty Co. v Worcester Housing Auth., 335 Mass 19; Oliver v City of Clairton, 374 Pa 333; Bleecker Luncheonette v Wagner, 141 NYS2d 293, affd 286 App Div 828.)
However, even where the law expressly defines the removal or prevention of "blight” as a public purpose and leaves to the agencies wide discretion in deciding what constitutes blight, facts supporting such a determination should be spelled out. It may be that plaintiff here would have no difficulty in doing so in its papers or by way of proof. It did not do so.
Here, other than the agency’s bare pleading of its "substandard” finding, it provided no further data as to the condition of the area, except for the general statement that at least 50% of the structures in the area are "substandard”, a figure which, as defendants point out, did no more than coincide with the figure found in an earlier comprehensive city plan, which had designated the area here involved as suitable for rehabilitation rather than clearance. No more can be found in the rest of the agency’s supporting papers. They supply only information about the improvements which will be made by *485 Otis after it receives the land and the conditions placed upon Otis’ subsequent use of the land. The agency has not indicated in any manner the grounds upon which it concluded that the land is presently substandard. Indeed, in its reply to defendants’ claims, the agency states that its findings in this regard are conclusive and establish a public purpose as a matter of law.
Extensive review of the case law both in New York and in our sister States regarding the proper scope of review which courts may apply to such agency findings reveals that, even where courts stated most strongly that their role in reviewing agency findings was a circumscribed one, more was required" to be submitted to the courts than the agency has supplied here. (See Urban Redevelopment Laws, Ann., 44 ALR2d 1414-1449, ALR2d Later Case Service 473-484, supplementing 44 ALR2d 1419-1449 and cases cited therein; What Constitutes "Blighted Area” Within Urban Renewal and Redevelopment Statutes, Ann., 45 ALR3d 1096-1137 and cases cited therein; Bosselman, Alternatives to Urban Sprawl: Legal Guidelines for Governmental Action, Research Report No. 15 to the National Commission on Urban Problems, Wash DC, 1968; Note, Urban Renewal: Problems of Eliminating and Preventing Urban Deterioration, 72 Harv L Rev 504.)
Carefully analyzed, it is clear that in such situations, courts are required to be more than rubber stamps in the determination of the existence of substandard conditions in urban renewal condemnation cases. The findings of the agency are not self-executing. A determination of public purpose must be made by the courts themselves and they must have a basis on which to do so. (Denihan Enterprises v O’Dwyer, 302 NY 451, supra.)
The rationale of Kaskel v Impellitteri (306 NY 73, supra) is not to the contrary. In Kaskel, while upholding a taking of land in Manhattan against an allegation by taxpayers that the taking was really for the purpose of obtaining Federal funds to support the erection of a new coliseum, the majority, after aflirming some of the general propositions we have noted above, held that such taxpayers, suing under section 51 of the General Municipal Law, were required to make out either actual fraud or illegality in the sense of a public expenditure totally beyond the power of an agency, because those are the only grounds on which otherwise uninjured taxpayers are permitted standing under section 51. Interestingly, the entire *486 court concurred in the initial premise of Judge Van Voorhis (who dissented on the facts) that, in order to utilize the public purpose attached to clearance of substandard land, such clearance must be the primary purpose of the taking, not some other public purpose, however laudable it might be.
The majority also noted that the plaintiff taxpayers did not dispute the factual findings of the agency, proof to support which had been presented to the court in some detail, even to the inclusion of photographs of the area condemned. Plaintiffs there disputed only the agency’s conclusion that clearance of a large area of land was justified by those facts. Pointing out that the pictures and data before them clearly showed slum conditions, the court said (p 78): "There is no dispute as to the physical facts * * * Power to make that determination has been lodged by the Constitution * * * and the statute * * * in the city planning commission and the board of estimate, and when those bodies have made their finding, not corruptly or irrationally or baselessly, there is nothing for the courts to do about it”.
Under Kaskel, then, summary judgment should be awarded to an Urban Renewal Agency if, in the first instance, it presents to the court an adequate basis upon which it concluded that the land was substandard, and if the landowners then cannot show that the agency’s determination is without foundation.
Despite the principles discussed, the landowners have failed to raise properly by their pleadings the issue of the quality of the taken land. Although they did refer to the land as not substandard, they deliberately subordinated, suppressed, and obscured that issue. Indeed, the arguments by the owners with respect to the quality of the land were offered as a makeweight only to their principal but irrelevant argument that turning over of the razed properties to Otis was not pursuant to a proper public purpose in ridding the community of substandard land. Repeatedly in their pleadings and their briefing defendant owners stressed that the issue is not the quality of the land (on which issue, they mistakenly said, they must lose because of the "omnipotence” given to urban renewal agencies), but, instead, is the alleged evil purpose in benefiting a large manufacturer which the city wishes to retain in the community.
As a consequence of this approach, the courts below were never confronted with the proper issue in the case and as a *487 further consequence, the owners must have failed in their contentions taken in gross. In the meantime, the taking has occurred without hindrance, the buildings have been demolished, and at this late date, owners seek not, in effect, the retention of their properties but the wreaking of some kind of vengeance on the city. In this status of the case, the subordination of a valid issue under an untenable contention, defendant owners are no longer entitled to relief and there should be an affirmance.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order affirmed, without costs.

 (US Const, 5th Amdt; NY Const, art I, § 7.)