671 P.2d 387

**CITY OF PHOENIX, a municipal corporation, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable William T. Moroney, judge thereof; Hurley Trust Company, an Arizona corporation; Jane Hurley Haney, Conservator of the Estate of John Cornelius Hurley; Irving Shuman, a single man; Joel D. Baker and Jane Doe Baker, his wife; Karl Nilson and Mary Beth Nilson, husband and wife; Doyle Roberson and Marjorie Roberson, husband and wife, Respondents.**

No. 16605–SA.

Supreme Court of Arizona, En Banc.

Sept. 15, 1983.

Andy Baumert, City Atty. by Robert A. Slonaker, Phoenix, for petitioner.

DeConcini, McDonald, Brammer, Yetwin & Lacy by Douglas G. Zimmerman and James W. Hill, Phoenix, for respondents Moroney, Hurley Trust, Haney, Shuman.

Johnson & Shelley by J. LaMar Shelley, Mesa, for amicus curiae League of Arizona Cities and Towns.

Jennings, Strouss & Salmon by Jay C. Stuckey, Jr., Stephen C. Earl, Phoenix, for amicus curiae Trammel Crow Co.

FELDMAN, Justice.

Petitioner (the City) brings this special action proceeding alleging that the respondent trial judge acted in excess of his authority and jurisdiction or abused his discretion in a condemnation action by denying the City's application for immediate possession of land owned or possessed by the real parties in interest (property owners). Finding that the petition presented important questions of general public interest and

that there is no remedy by appeal, we accepted jurisdiction. We have such jurisdiction under Ariz. Const. art. 6, § 5, and Ariz.R.Sp.Act. 4, 17A A.R.S.

The City sought to condemn the property in issue under authority granted in A.R.S. §§ 36–1471 to –1491 for slum clearance and redevelopment and to gain immediate possession of the property under § 12–1116.[1] A prerequisite to the exercise of the powers of eminent domain for slum clearance and redevelopment is that the municipality adopt a resolution finding that a slum or blighted area exists, § 36–1473, and that the property to be condemned is "necessary for or in connection with a redevelopment project," § 36–1478. The City Council adopted such a resolution, but the trial judge refused to grant the City's application for immediate possession, ruling that:

> Upon evidence presented to the Court, the Court finds that the subject property is not a part of a blighted area, nor part of a slum area....

The ultimate issue before this court, therefore, is whether the trial judge acted properly in finding that the subject property was not a part of a slum or blighted area in the face of the City's adoption of a resolution to the contrary. This issue poses the question of whether the determination that property is within a slum or blighted area is a legislative or judicial question.

The City argues here that it is empowered by law to condemn property for redevelopment of slum or blighted areas and the subject property is necessary for such a redevelopment project. The City Council had made an express finding to that effect and claims that the determination of the existence of blight is essentially a determination of the necessity of the taking and is a legislative question subject to only extremely limited review by the courts. Thus, the City contends that the trial court abused its discretion in finding that there was no blight and that, therefore, the prop-

---

1. A.R.S. § 12–1116 permits a governmental body which has filed an action to condemn real property to acquire possession of that property in advance of trial, providing that the condemnor can show that the taking is "necessary" and posts a bond to cover the "probable damages."

erty could not be condemned. The property owners, on the other hand, argue that the City is not empowered to condemn land unless it is used for a public purpose, and that if there is no blight, redevelopment is not for a public purpose. They contend, therefore, that the determination of the existence of "blight" essentially puts in question the existence of public purpose, which is a judicial and not a legislative question. We disagree with both positions. A review of the division of judicial and legislative authority in eminent domain proceedings is helpful in the resolution of this issue and other minor issues raised in this special action.

█ At the outset, we note that generally no condemning body may exercise the power of eminent domain unless the property which is to be taken is to be put to a "public use." Ariz. Const., art. 2, § 17. If put in issue, "the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public." *Id.*

█ As stated above, municipalities are empowered to acquire property for "slum clearance and redevelopment." *See* A.R.S. §§ 36–1471 to –1491. The legislature has asserted that acquisition of property pursuant to the cited slum clearance and redevelopment provisions "are public uses and purposes for which public money may be expended and the power of eminent domain exercised." A.R.S. § 36–1472(4). Since the statutory assertion directly contradicts the constitutional injunction that the question of public use "shall be a judicial question" determined "without regard to any legislative assertion that the use is public," we shall proceed to do as the constitution commands and disregard the quoted provisions of A.R.S. § 36–1472(4). It is generally accepted, however, that the taking of property in a so-called slum or blighted area for the purpose of clearing and "redevelopment," including sale before or after reconstruction to a private person or entity for operation of a public or private business, is a "public use." *See Cordova v. City of*

*Tucson,* 16 Ariz.App. 447, 449, 494 P.2d 52, 54 (1972); 2A Nichols, *Eminent Domain* § 7.51561 (3d ed. 1981). We see no reason to depart from this rule.

Although not expressed in our constitution, the exercise of the power of eminent domain is also conditioned upon a showing that the property is "needed" for that use. A.R.S. § 12–1116(C); 1 Nichols, *supra,* § 4.11[1]. With respect to "slum clearance," the legislature has expressly conditioned the exercise of the power of eminent domain upon a determination that the property is "necessary for or in connection with a redevelopment project." A.R.S. § 36–1478. To help in the process, the legislature has declared that there exist within our municipalities "slum and blighted areas," that these are "a serious and growing menace, injurious and inimical to the public health, safety, morals and welfare" (A.R.S. § 36–1472(1)) and contribute to the "spread of disease and crime," thus requiring excessive expenditures of public money and constituting "an economic and social liability" which "substantially impairs or arrests the sound growth of municipalities ...." *Id.,* subsec. (2). Therefore, the legislature has declared that the necessity for the statute's authorizing taking of property for redevelopment of slum and blighted areas is "a matter of legislative determination." *Id.,* subsec. (5).

█ Of course, the legislature's statement that something is "a matter of legislative determination" does not make it so if it is a matter of judicial determination. However, we agree with the legislature that the question of necessity of a taking is essentially legislative in nature and that a legislative declaration of necessity should be given weight. *Citizens Utilities Water Co. v. Superior Court,* 108 Ariz. 296, 299, 497 P.2d 55, 58, *cert. denied,* 409 U.S. 1022, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972); *Mosher v. City of Phoenix,* 39 Ariz. 470, 482, 7 P.2d 622, 626 (1932), *modified, In re Forsstrom,* 44 Ariz. 472, 38 P.2d 878 (1934); *City of Phoenix v. McCullough,* 24 Ariz.App. 109, 114, 536 P.2d 230, 235 (1975); 1 Nichols, *supra,* § 4.11[1]. Notwithstanding this rule, however, the

courts have reviewed the evidence presented to determine whether a municipality's declaration of necessity was arbitrary or capricious. *Citizens Utilities Water Co. v. Superior Court, supra.* Our court of appeals correctly stated the rule as follows:

> [A] condemnor's determination of necessity should not be disturbed on judicial review in the absence of fraud or arbitrary and capricious conduct.

*City of Phoenix v. McCullough,* 24 Ariz. App. at 114, 536 P.2d at 235. *See also* 1 Nichols, *supra,* §§ 4.11[2] and [3].

The trial judge, however, did not hold that the acquisition of the parcel at issue was for a private rather than a public use, nor that the acquisition of the property was unnecessary. He held, rather, that the property "is not a part of a blighted area, nor part of a slum area as those terms are defined [in the statute]." We believe that the finding that an area is a slum or blighted is an inquiry somewhat different from the issues of public use or necessity. By the very wording of the statute the municipality is required to make an express "finding" that a slum or blighted area exists as a prerequisite to the municipality's use of *any* of the powers conferred by the slum clearance and redevelopment act. A.R.S. § 36–1473.[2]

Is this a determination analogous to that determination of "necessity", so that it is a legislative, rather than judicial, question? We note that the express words of the statute charge the governing body of the municipality, and not the judiciary, with the obligation and power to make the "finding" that is a prerequisite for the exercise of the power to condemn. In this connection, we agree with the words of the Washington Supreme Court:

> [T]he conclusion of the trial court on the issue of blight (likewise, the conclusion of this court) is not material, as neither this court nor the superior court has been designated by the legislature to determine from the evidence submitted whether or not an area is "blighted." The legislature has designated "the local governing body" (City Council) to make that determination.

*Apostle v. City of Seattle,* 70 Wash.2d 59, 64, 422 P.2d 289, 292 (1966). *See also Tucson Community Development and Design Center, Inc. v. City of Tucson,* 131 Ariz. 454, 459, 641 P.2d 1298, 1303 (App.1982).

Moreover, we believe that the nature of the determination is better suited to legislative than judicial resolution. Essentially, the determination of such questions as whether an area is blighted and requires development, is arid and requires reclamation, is subject to flooding and requires a flood control project, or has inadequate air service and requires construction of an airport facility, involves knowledge of a wide range of social and economic circumstances and the application of broad measures of public policy;[3] they are therefore much more suitable to legislative determination than they are to determination by a judicial tribunal which is bound by rules circumscribing the sources of its knowledge and by evidentiary rules which are not truly suited to determine such broad and imprecise questions as whether an area is a "slum" or is "blighted." The City Council is not

---

**2.** § 36–1473 provides:
> No municipality shall exercise any of the powers conferred upon municipalities by this article until its local governing body adopts a resolution *finding* that:
> 1. One or more slum or blighted areas exist in the municipality, and
> 2. The redevelopment of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents of the municipality.
> (Emphasis supplied.)

**3.** We recognize, for instance, that the solution of many of such issues lies in the eyes of the beholder. Thus, what one person sees as arid land in need of reclamation, another sees an unspoiled desert, providing the natural habitat of desert plants and animals. What one city dweller sees as a slum, another may consider an historical neighborhood. What some describe as urban redevelopment, others consider "gentrification". What some see as construction of badly needed freeways, others see as a wasteful boondoggle creating more traffic while further destroying established neighborhoods. Much can be said for either side of each argument.

bound by such restrictions and is permitted and expected to talk to a variety of people, walk through the proposed project, and gather information from all sources. When legislators decide that a neighborhood is blighted or a slum, they decide a matter of policy for which there is always a remedy by election of those who will change the policy. When judges make such decisions as matters of law, one must wait for change in fact or in the common law, at best a slow process, in order to obtain redress.

 Thus we find that the determination of whether an area is a slum or blighted is analogous to the question of necessity and is a legislative question. *Tucson Community Development and Design Center, Inc. v. City of Tucson, supra. Cf.* 2A Nichols, *supra,* § 7.51561[1], p. 7–223, citing *Apostle v. City of Seattle, supra.* This does not mean, however, that the courts are necessarily forbidden to undertake any review of the actions of the Council. The statute clearly sets out the factors which define a slum or blighted area and the Council must base its finding upon a consideration of those factors.[4] In our view, however, the fact that, unlike the succeeding sections dealing with adoption of the plan (*see, e.g.,* § 36–1479), § 36–1473 does not require hearings is indicative that the Council need not sit as a quasi-judicial body and hold a formal evidentiary hearing before making the requisite finding. It may make that finding on the basis of information provided it by its staff, reports filed with it, the evidence of the eyes and ears of the members of the Council, and all other sources that legislative bodies generally rely upon in reaching conclusions. No formal hearing is required. *Tucson Community Development and Design Center,* 131 Ariz. at 459, 641 P.2d at 1303. Nevertheless, the statute requires findings; therefore, whatever the basis or method they use to reach their conclusion, the governing body must state the ultimate findings.

[E]ven where the law expressly defines the removal or prevention of "blight" as a public purpose and leaves to the agencies wide discretion in deciding what constitutes blight, facts supporting such a determination should be spelled out.

*Yonkers Community Development Agcy. v. Morris,* 37 N.Y.2d 478, 484, 373 N.Y.S.2d 112, 119, 335 N.E.2d 327, 332 (1975).

 We believe that Courts "are required to be more than rubber stamps in the determination of the existence of substandard conditions in urban renewal condemnation cases." *Id.* at 485, 373 N.Y.S.2d at 120, 335 N.E.2d at 333. The court, therefore, is not precluded from reviewing the findings expressed in the City's resolution. The court of appeals has previously considered the proper standard of review and we adopt their language.

The legislative requirement that these findings [of a slum or blighted area] be

---

4. Blighted and slum areas are defined by A.R.S. § 36–1471 as follows:

 2. "Blighted area" means an area, other than a slum area, which by reason of the predominance of defective or inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility or usefulness, unsanitary or unsafe conditions, deterioration of site or other improvements, diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of a municipality, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to the public health, safety, morals or welfare in its present condition and use.

 . . . .

 18. "Slum area" means an area in which a majority of the structures are residential, or an area in which there is a predominance of buildings or improvements, whether residential or nonresidential, and which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision of ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency or crime, and is detrimental to the public health, safety, morals or welfare.

made by the governmental body is analogous to the requirement that the condemning body make findings of necessity in eminent domain. The proper scope of judicial review is ... [that] "... a condemnor's determination of necessity should not be disturbed on judicial review in the absence of fraud or arbitrary and capricious conduct." ...

This does not mean that the court reviews the evidence, if any, which was before the governmental body when it adopted the initial resolution of necessity. It means that the court may receive evidence at trial on the issue of necessity vel non and may determine, from that evidence, whether the resolution of necessity was arbitrary. If the evidence is such that the city could reasonably have found necessity, or in the case before us, a condition of blight, the resolution is not arbitrary. "Even if the City's action ... is reasonably doubtful ... or even fairly debatable, we cannot substitute our judgment for that of the City Council."

*Tucson City Development and Design Center,* 131 Ariz. at 459, 651 P.2d at 1303 (citations omitted), quoting from *City of Phoenix v. McCullough,* 24 Ariz.App. at 114, 536 P.2d at 235, and *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corp.,* 518 S.W.2d 11, 16 (Mo.1974) (question on review is limited to whether the legislative act of declaring the area blighted was arbitrary or induced by fraud, collusion or bad faith. *Id.* at 15.).

■ We must, then, apply this standard of review to the facts of the case at bench. We note first that in adopting Resolution No. 15431, entitled "A Resolution Finding the Existence of a Slum and Blighted Area in the City of Phoenix; Declaring the Necessity for Redevelopment ...," the City Council quite properly made express findings in the "whereas" clauses of the resolution. *See Yonkers Community Development Agcy, supra.* We consider next the evidence presented at the hearing for immediate possession to determine whether the City Council's findings were arbitrary or capricious.

The evidence before the trial court showed that the "blighted area" being taken for this redevelopment project generally surrounded the Good Samaritan Hospital facilities in central Phoenix. The area was bounded on the north by a line approximately one-half block north of McDowell Road (a main east-west artery) and on the south by the right-of-way for the proposed Papago Expressway project. The east and west boundaries were approximately fixed at 13th Street and 7th Street. The area encompassed approximately thirty to thirty-five square blocks. It was surrounded on three sides by existing redevelopment projects. The property in question is located in the northwest quadrant of the area at the southeast corner of McDowell Road and 9th Street; it is a small lot, approximately 63 feet by 100 feet in size, improved with a small commercial building. The building is vacant, but previously was used as a flower and gift shop. The redevelopment plan which was subsequently adopted by the City Council anticipated that the lot would be acquired, the improvements demolished, and the lot sold to a private developer with the requirement that it be a part of the construction of a complex of medical office buildings.

The City offered the testimony of Mr. Theodore P. Brookhart, the supervisor of the neighborhood development section of the Planning Department of the City of Phoenix. Mr. Brookhart testified that the appropriate agencies had investigated and surveyed the area and had reported to the City Council prior to the adoption of the resolution declaring the area was blighted. The information given the City Council pertained to structural conditions in the area, crime statistics, land use, deterioration of units, street layout, degree of building overcrowding, age and obsolescence of buildings, lot layouts as they related to current development standards, information on ownership of property and like matters. Included in the information were statistics which indicated that 60% to 80% of the residential properties in the area as a whole were in absentee ownership, some of that ownership being for the purpose of specula-

tion and eventual conversion of property to nonresidential use when and if the zoning was changed. Crime statistics reported to the Council indicated that for the two years prior to the adoption of the resolution, crimes in the area had ranged from 74% to 116% higher than the City average, the adult arrest rate was from 34% to 116% higher than the City average, that much of the former residential area had been "cleaned out" by the proposed freeway takings, that many of the structures were in a state of "disrepair," that over 60% of the structures were not "sound," that 47% needed minor repairs and 18% needed major repairs and 1% "you couldn't do anything with." Further information indicated that street layouts were "undesirable from a planning perspective," and that nonresidential exterior traffic was using residential streets in the area for "short-cutting."

Many factors to which Brookhart testified and which were reported to the City Council before adoption of the resolution were unquestioned in the evidence before the trial judge. Even if there was some question about many of the factors and much question about some of them, we must bear in mind the extremely broad definitions of "slum area" and "blighted area" contained in the statutes quoted in note 4, *supra*. Further, case law "universally" endorses the following principles pertaining to the determination of "blight":

Many factors and interrelationships of factors may be significant. These may include such diverse matters as irregularity of the plots, inadequacy of the streets, diversity of land ownership making assemblage of property difficult, incompatibility of the existing mixture of residential and industrial property, overcrowding, the incidence of crime, lack of sanitation, the drain an area makes on municipal services, fire hazards, traffic congestion, and pollution. It can encompass

areas in the process of deterioration or threatened with it as well as ones already rendered useless, prevention being an important purpose. It is "something more than deteriorated structures. It involves improper land use. Therefore its causes, originating many years ago, include not only outmoded and deteriorated structures, but unwise planning and zoning, poor regulatory code provisions and inadequate provisions for the flow of traffic."

*Yonkers Community Development Agcy.,* 37 N.Y.2d at 483, 373 N.Y.S.2d at 118–119, 335 N.E.2d at 332, citing Cook, *Battle Against Blight,* 43 Marquette L.Rev. 444, 445 (1960). We believe that the evidence presented to the trial judge established that there were facts which tended to support the findings of the City Council that the area in question was a slum and blighted.

Nevertheless, the trial judge divided the area into five sub-areas (as had the City for study purposes) and found [5] that neither the subject property nor its immediate two sub-neighborhoods qualified as "blighted." Even if this finding were supported by evidence, we must bear in mind that:

Property may of course be taken for this redevelopment which, standing by itself, is innocuous and unoffending.... [I]t is the need of the area as a whole which Congress and its agencies are evaluating. If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly.... But as we have already stated, community redevelopment programs need not, by force of the Constitution be on a piecemeal basis—lot by lot, building by building.

*It is not for the courts to oversee the choice of the boundary line nor to sit in*

---

**5.** The language used by the trial judge was as follows: "... The court finds that the subject property is not part of a blighted area, nor part of a slum area...." The order does not indicate that the court limited itself to review to determine whether the council's findings were arbitrary, fraudulent, collusive or in bad faith.

If we take the court's language at face value, it made an independent finding based on the weight of the evidence before it. This would be improper, as noted above, since the court is not charged with the responsibility to make a de novo determination of the existence of blight or slum conditions.

*review on the size of a particular project area.* Once the question of the public purpose has been decided, the amount and character of the land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

*Berman v. Parker,* 348 U.S. 26, 35, 75 S.Ct. 98, 104, 99 L.Ed. 27 (1954) (emphasis supplied). The question deals "with the area concept and not with whether any particular property was standard or substandard." *Apostle v. City of Seattle,* 70 Wash.2d at 62, 422 P.2d at 291, citing *Miller v. City of Tacoma,* 61 Wash.2d 374, 392, 378 P.2d 464, 475 (1963), and *Berman v. Parker, supra.*

We hold, therefore, that the function of the judiciary in determining whether an area is a slum or blighted area is to review the findings of the governing body, rather than to make an original determination. We hold further that the standard of review is limited to questions of fraud, collusion, bad faith or arbitrary and capricious conduct by the governing body. If evidence taken at the hearing before the trial court indicates that the findings of the governing body have some reasonable support in the facts, even though those findings may be reasonably doubtful or fairly debatable, the findings of the governing body must be sustained. Resolution No. 15431, declaring the area which included the subject property was a slum or blighted area, set forth specific grounds for the Council's ultimate finding. From the evidence before him, the trial judge could not properly have found that the Council's determination of blight was arbitrary. Accordingly, we hold that the trial judge exceeded his legal authority and erred in refusing to grant the City's application for setting of a bond and taking immediate possession in accordance with A.R.S. § 12–1116(C).

Petitioners prayer for relief is granted; the trial court's order of April 5, 1983, denying the City's "Application to be Let into Possession", is vacated; the Respondent judge is instructed to allow the Petitioner, City of Phoenix, to take possession pursuant to A.R.S. § 12–1116, and to proceed thereafter in a manner not inconsistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.