**W. & G. COMPANY, a Utah general partnership; Darol Krantz, an individual, dba Broadway Music; J. Ross Trapp, Trustee of the Ross Trapp Trust and Trustee of the June Trapp Trust; National Department Store, a Utah corporation; Robert C. Nelson, dba The Magazine Shop; and Downtown Athletic Club, a Utah corporation, Plaintiffs and Appellees,**

v.

**REDEVELOPMENT AGENCY OF SALT LAKE CITY, Salt Lake City Corporation, Ted L. Wilson, in his official capacity as a member and chief operating officer of the Board of Directors of the Redevelopment Agency of Salt Lake City; Ronald J. Whitehead, Grant Ma-**

---

bey, Sidney R. Fonnesbeck, Earl S. Hardwick, Ione M. Davis and Edward Parker, in their official capacities as members of the Board of Directors of the Redevelopment Agency of Salt Lake City, and Michael Chitwood, in his official capacity as the Executive Director of the Redevelopment Agency of Salt Lake City, Defendants and Appellants.

No. 890285–CA.

Court of Appeals of Utah.

Nov. 30, 1990.

Harold A. Hintze (argued), Provo, for defendants and appellants.

Robert S. Campbell, Jr. (argued), Barney Gesas, Salt Lake ·City, for plaintiffs and appellees.

Craig G. Adamson, Salt Lake City, for plaintiffs and appellees, J. Ross Trapp, Trustee of the Ross Trapp Trust and Trustee of the June Trap trust.

Before GARFF, JACKSON and ORME, JJ.

## OPINION

GARFF, Judge:

Appellant, the Redevelopment Agency of Salt Lake City (RDA), seeks reversal of the district court's order granting partial summary judgment in favor of appellee Robert C. Nelson dba The Magazine Shop,[1] and denying RDA's motion for partial summary judgment.

In 1969, the Utah Legislature adopted the Utah Neighborhood Development Act (the Act), found in Utah Code Ann. § 11-19-1 et seq., which creates and empowers municipal redevelopment agencies such as the RDA to acquire and redevelop property determined to be "blighted." *See Redevelopment Agency of Salt Lake City v. Tanner*, 740 P.2d 1296, 1297 (Utah 1987). Pursuant to this act, Salt Lake City's Board of Commissioners (Commission) and, subsequently, its City Council, were designated to act as the city's redevelopment agency. *Id.* Defendants Nelson, W & G Company, Broadway Music, J. Ross Trapp, National Department Store, and Downtown Athletic Club (Landowners), at the times relevant to these events at issue in this case, were property owners having separate interests in properties on Block 57 in Salt Lake City.

On February 4, 1971, the RDA adopted the Central Business District (CBD) West Neighborhood Development Program, which included two and one-half blocks of the downtown Salt Lake City business district. In May 1975, the RDA passed a resolution to consider the adoption of an ordinance amending the redevelopment plan to include an additional eleven blocks of the downtown business district, including Block 57. In this resolution, the RDA designated this area as a redevelopment survey area, and decided that it required further study to determine whether one or more redevelopment projects within its boundaries were feasible. It directed the RDA staff to select one or more project areas comprising "all or part of the above described redevelopment survey area," and to formulate a preliminary redevelopment plan.

To this end, the public hearings were held on the adoption of this ordinance on July 31 and August 4, 1975 before the RDA, and on September 3, 1975 before the Commission. Although the RDA notified every property owner in the affected area by mail prior to the hearings, no Landowners attended these hearings.

During the hearings, the RDA's executive director, Michael Chitwood, assured those present that all owners of property designated for redevelopment by the RDA would be provided notice and hearing, along with detailed architectural information about the renovation of their properties, and that property acquisition would not occur without their approval and consent.

On September 10, 1975, the Commission passed an ordinance adopting the CBD West Neighborhood Development Plan and mailed a copy of the ordinance to every property owner in the affected area, including Landowners.

On May 14, 1982, the RDA again notified all affected property owners, including Landowners, of another set of public hearings to be held for the purpose of amending and updating the CBD West Neighborhood Development Plan. The notification letter described proposed housing rehabilitation and sidewalk beautification programs for the central business district. Landowners understood from this letter that the proposed modifications' only relevance to their properties would be curb, gutter, and sidewalk beautification along Main, State, and Third South Streets. Consequently, Landowners did not attend hearing.

At the hearings, held in June 1982, neither the RDA nor the Commission received evidence on the issue of blight, nor did they find that Landowners' properties were either blighted, or detrimental to the public

---

1. W & G Company, Broadway Music, J. Ross Trapp, National Department Store, Downtown Athletic Club, and Robert C. Nelson dba The Magazine Shop, subsequent to bringing this appeal, settled with the RDA and are no longer involved in the appeal. Their settlement agreements did not affect any of the rights of the remaining party, Robert C. Nelson.

health, safety, or welfare. Instead they only designated a twenty-six and one-half block area as a redevelopment survey area. This survey area included such notable civic and cultural buildings as the Hotel Utah, the Kennecott Building, the ZCMI Center, the Tracy Office Center, the Tribune Building, the Kearns Building, the Walker Bank Building, and the Deseret Building.

On June 15, 1982, the RDA proposed the adoption of the amended redevelopment plan and found that the "project area comprising the major portion of the central business district of Salt Lake City as above described is a 'blighted area' as defined in Section 11–19–2, Utah Code Annotated 1953, as amended, and that redevelopment of said area is necessary to effectuate the public purposes set forth in the Utah Neighborhood Development Act." The Commission subsequently passed an ordinance to adopt the CBD West Neighborhood Development Plan. It did not mention Block 57 or its allegedly blighted nature, nor did it indicate that the RDA intended to redevelop Landowners' properties that year or at any time thereafter. Instead, the plan articulated generalized objectives of substandard building removal, land development, rehabilitation of buildings, and elimination of other environmental deficiencies, and set forth only very general means of achieving those objectives.[2] This ordinance was published in the Deseret News on July 2, 1982.

On June 2, 1983, the RDA met and discussed a potential expenditure of $130,000 for a blight study of Block 57, but did not approve the study. On February 9, 1984, the RDA again met and decided that Block 57 was "so obviously blighted"[3] that it was unnecessary to spend even $20,000 for a blight study, so moved, instead, to perform an economic base study on the Block.

J. Ross Trapp, one of the Landowners, testified that in 1984, following a fire that virtually destroyed his property on Block 57, he discussed rebuilding plans with the RDA's executive director, Michael Chitwood, and then applied for and received a building permit from Salt Lake City Corporation to rebuild and refurbish his property. At that time, Chitwood denied that the RDA was contemplating any plan for involuntary condemnation of the Trapp property or any other Block 57 properties, but indicated that there might be a possibility in the future of "friendly" condemnation in order to acquire property for future use. Relying upon this assurance, Trapp spent approximately $495,000 to remodel his property. Neither the RDA nor Salt Lake City objected to or attempted to dissuade or stop Trapp from embarking upon this

---

**2.** The project area "plan" included the following objectives:

  1. Removal of structurally substandard buildings to permit the return of the project area to economic use and new construction.
  2. Removal of impediments to land disposition and development through assembly of land into reasonably sized and shaped parcels served by improved public utilities and new community facilities.
  3. Rehabilitation of buildings to assure sound long term economic activity in the core of the City.
  4. The elimination of environmental deficiencies, including among others, small and irregular lot subdivision, overcrowding of the land, and inadequate off-street parking....
  9. Provision for improvements of public streets, curbs and sidewalks, other public rights-of-way, street lights, and landscaped areas.

However, it only outlined very general means to achieve these objectives:

  Activities contemplated in carrying out the program in the Area include the acquisition, clearance and rehabilitation of properties in the project area.
  1. Rehabilitation—Properties determined to be in substandard condition by the Redevelopment Agency of Salt Lake City, and not otherwise needed for redevelopment, may be sufficiently rehabilitated to insure a remaining economic life of twenty years.
  2. Acquisition and Clearance—Parcels of real property located in the project area may be acquired by purchase or condemnation.
  3. Implementation of Redevelopment Projects—Redevelopment projects may be undertaken and carried out on a yearly basis as provided in Section 11–19–13 Utah Code Annotated 1953, as amended. The planning and implementation of redevelopment projects on a yearly basis shall be designated as an annual implementation program.

**3.** It is noteworthy that one of the Landowners, J. Ross Trapp, submitted the affidavit of a structural engineer which stated unequivocally that Trapp's Block 57 property was structurally sound and unblighted.

remodeling project. Further, they never notified him or any of the other Landowners that their property had been determined to be "blighted," and did not notify them of a time and place to challenge this determination.

Several months later, in late 1984, the RDA attempted to acquire Trapp's property, along with that of the other Landowners, through its eminent domain power. The RDA's letter to Landowners stated that the Salt Lake City Council, on August 9, 1984, had authorized it to acquire Block 57 properties for redevelopment activities.

In 1984 and 1985, the RDA continued to send to each Block 57 Landowner written notices that it intended to acquire their properties and that it would do so by condemnation if necessary.

Landowners filed this action on February 19, 1985, challenging the 1982 ordinance. They sought injunctive and declaratory relief, alleging that the ordinance and the CBD West Neighborhood Development Plan were procedurally and substantively defective, that their property was not and had not been determined to be "blighted," and that the RDA was not entitled to condemn or otherwise acquire their properties. Most of the other Utah municipal redevelopment agencies moved to intervene.

After some discovery, Landowners filed a motion for partial summary judgment, seeking a determination that the RDA did not, as required under Utah Code Ann. § 11-19-19 (1971), make a determination that Landowners' properties were blighted. Landowners argued that RDA did not restrict the project area to buildings which were "detrimental or inimical to the public health, safety, and welfare" and that RDA's notices of public hearings concerning the adoption of the 1982 plan did not give reasonable notice to Landowners that their Block 57 properties might be acquired for redevelopment.

In response, the RDA filed a motion for partial summary judgment on the grounds that Landowners' complaint was time-barred under Utah Code Ann. § 11-19-20 (1971) because its 1982 proceedings were controlling. The trial court did not immediately rule on this motion. After some discovery, the RDA again moved for summary judgment, asserting this time that its 1975 proceedings should govern the court proceedings. It sought a determination that: (1) RDA could acquire properties within a general area without regard as to whether any specific property was "blighted," (2) RDA had given proper notice to Landowners and the necessary hearings had been held, (3) RDA had met the necessary jurisdictional requirements entitling it to enforce its 1982 redevelopment plan, and (4) Landowners' motion for summary judgment should be dismissed on the grounds that the applicable statute of limitations had run.

The parties' motions for summary judgment came up for hearing on May 15, 1986. At the outset, all parties stipulated that there were no genuine issues of material fact. The trial court ruled that the 1975 notices and proceedings did not meet minimum due process requirements, and that the 1982 notices and proceedings, which it concluded were constitutionally inadequate, were insufficient to start the statute of limitations to run. Other aspects of the motions were taken under advisement. On September 8, 1986, the court entered its order granting Landowners' motion for summary judgment. It determined that the RDA and Salt Lake City had failed to comply with the requirements of the Utah Neighborhood Development Act and that the requirements were jurisdictional in nature, and ordered that the RDA could not acquire Block 57 by condemnation or threat thereof.

The RDA filed its notice of appeal on October 6, 1986. Subsequently, this court determined that one of the Landowners, Downtown Athletic Club, had no interest in any property within Block 57. *See Downtown Athletic Club v. Horman,* 740 P.2d 275 (Utah Ct.App.1987). W & G Company, Broadway Music, J. Ross Trapp, and National Department Store settled with the RDA, leaving Robert C. Nelson, dba The Magazine Shop, as the only active appellee in this appeal.

On appeal, the RDA raises the following major issues: (1) Whether Landowners' action is barred by the applicable statute of limitations. (2) Whether the notices of the public hearings held in 1975 and 1982 were constitutionally inadequate, in that they denied Landowners due process of law. (3) Whether the RDA is statutorily required to make a property-by-property finding of blight as a prerequisite to the acquisition of property by eminent domain for urban redevelopment. We first address the notice and statute of limitations issues in the context of the RDA's condemnation procedure, and then address the blight finding issue.

## STANDARD OF REVIEW

In reviewing this summary judgment, we analyze the facts and inferences in the light most favorable to the losing party, and affirm only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Provo City Corp. v. State of Utah,* 795 P.2d 1120, 1121–22 (1990). We do not, however, defer to the trial court's conclusions of law, but review them for correctness. *Id.*

## I. ADEQUACY OF CONDEMNATION PROCEDURE

The RDA argues that this matter is governed by the applicable statute of limitations because all such claims are barred unless raised within thirty days from the publication of the ordinance finding blight and adopting a redevelopment plan pursuant to Utah Code Ann. § 11–19–20 (1971).[4] It alleges that it had set forth its redevelopment plan in 1975, and then enacted yearly implementation ordinances in 1977 and 1982. Landowners, nevertheless, waited for ten years to raise their claim, thereby failing to comply with the thirty day deadline. Landowners disagree, arguing that they did not receive constitutionally adequate notice to make the RDA's action against them valid.

Because redevelopment is a serious action with the potential to harm individual property rights, the Utah Supreme Court has held that "strict compliance with the enabling legislation is required to enact an ordinance setting up a redevelopment plan." *Salt Lake County v. Murray City Redevelopment,* 598 P.2d 1339, 1344 (Utah 1979). Furthermore, "where the statute prescribes certain steps to be taken before initiating condemnation proceedings, such steps are jurisdictional, and may not be disregarded." *Id.* at 1345 (quoting *Town of Tremonton v. Johnston,* 49 Utah 307, 164 P. 190, 191 (1917)).

It is well established that "[t]imely and adequate notice and an opportunity to be heard in a meaningful way are the very heart of procedural fairness." *Nelson v. Jacobsen,* 669 P.2d 1207, 1211 (Utah 1983). Under the Neighborhood Development Act, notice must be given in compliance with the statutory scheme and must be sufficient. *Murray City Redevelopment,* 598 P.2d at 1344. To be sufficient, the notice must advise the parties of the specific issues which they must prepare to meet. *State v. Gibbs,* 94 Idaho 908, 500 P.2d 209, 215 (1972). Thus, the party must be given a "reasonable opportunity to know the claims of the opposing party and to meet them." *White v. Bd. of Trustees of W. Wyoming Community College Dist.,* 648 P.2d 528, 535 (Wyo.1982) (quoting *Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938)); *see also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citation omitted) (notice must be of such a nature as to

---

**4.** The RDA relies for this argument upon Utah Code Ann. § 11–19–20 (1971) (emphasis added):
The legislative body by ordinance may adopt the project area redevelopment plan in its original form or as modified as the official redevelopment plan for the project area. *For a period of thirty days after publication of the ordinance adopting the project area redevelopment plan, any person in interest shall have the right to contest the legality of the ordinance, but after this period of time no one shall have any cause of action to contest the regularity, formality or legality of the ordinance for any cause whatsoever.*
This statute was amended in 1983 to allow a sixty-day period to contest the legality of the ordinance, rather than a thirty-day period.

reasonably convey the required information, and it must afford a reasonable time for those interested to make their appearance.); *Ellison, Inc. v. Board of Review,* 749 P.2d 1280, 1284 (Utah Ct.App.1988) ("interested parties are entitled to notice of proceedings which adequately informs them of the specific issues they must be prepared to meet"). Thus, where notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him or her, a party is deprived of due process. *Nelson,* 669 P.2d at 1212.

In the context of this proceeding, fair notice that would trigger the statute of limitation requires that Landowners be apprised that their property would be the subject of specific redevelopment activity under the proposed plan.

■ Under the Utah Neighborhood Development Act as it existed in 1982,[5] the following four steps were required for the creation and implementation of a redevelopment program in communities having a planning commission and a master or general community plan.

First, the redevelopment agency or municipal legislative body must designate a redevelopment survey area. Utah Code Ann. § 11–19–6 (1971). This redevelopment survey area is defined as "an area of a community designated by resolution of the legislative body upon recommendation of the agency for study by the agency to determine if a redevelopment project or projects within said area are feasible." Utah Code Ann. § 11–19–2(13) (1971). The resolution designating this survey area must include: (a) a finding that the area requires study to determine if a redevelopment project within the area is feasible, and (b) a description of the survey area boundaries. Utah Code Ann. § 11–19–8 (1971). The plan must be adopted by a resolution of the legislative body or the governing body of the agency. Utah Code Ann. § 11–19–6 (1971).

Second, the RDA shall select one or more project areas comprising all or part of the redevelopment survey area. Utah Code Ann. § 11–19–10 (1971). The project area must only include "buildings, improvements, or lands which are detrimental or inimical to the public health, safety, or welfare." Utah Code Ann. § 11–19–9 (1971). The RDA must then prepare a preliminary redevelopment plan for each project area. Utah Code Ann. § 11–19–10; *see Murray City Redevelopment,* 598 P.2d at 1346. This preliminary plan need not be detailed, but must include: (a) a description of the project area boundaries; (b) a general statement of the land uses, street layout, population densities, and other proposed redevelopment standards; (c) a statement of how the purposes of the Act will be attained by the redevelopment; and (d) a showing that the proposed redevelopment conforms to the master or general community plan. Utah Code Ann. § 11–19–11 (1971).

Third, the RDA shall prepare a detailed redevelopment plan for each project area, and shall hold a public hearing for this purpose. Utah Code Ann. § 11–19–12 (1971). Notice must be given to property owners so that, if they choose, they may attend the hearing to present evidence and confront witnesses as to whether their property is detrimental or inimical to the public interest. Utah Code Ann. § 11–19–12, –16, –17, and –18 (1971). Once a redevelopment plan is approved by the RDA, it must then be submitted to the municipal legislative body for adoption. Utah Code Ann. § 11–19–13 (1971). This adoption must also be done by means of a public hearing, for which notice must also be given to property owners. Utah Code Ann. § 11–19–15 and –16 (1971). The ordinance adopting the redevelopment plan must contain, among other things, the findings and determinations of the legislative body, based upon fact, that: "(a) the project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this act," and "(f) the condemnation of real property, if provided for in the redevelopment plan, is necessary to the execution of the rede-

5. The Act was amended in 1983. *See* L.Utah 1983, ch. 40, § 5.

velopment plan...." Utah Code Ann. § 11–19–21(5) (1971).

Finally, once the legislative body has adopted the redevelopment plan, the RDA shall carry it out. Utah Code Ann. § 11–19–13 (1971). Implementation and funding for the redevelopment project is to be done on a yearly basis.[6] Utah Code Ann. § 11–19–13 (1971).

In the present case, it is undisputed that Salt Lake City had, at all times material to this action, a planning commission and a master or general community plan. In May 1975, the RDA passed a resolution designating a redevelopment survey area which included Block 57. One of the purposes of the resolution was to determine if one or more redevelopment projects in the area were feasible. Thus, the RDA complied with the first step.

The resolution designating the redevelopment survey area directed the RDA staff to select one or more project areas comprising all or part of the redevelopment survey area, and to formulate a preliminary redevelopment plan. They did so.

Prior to the hearing held on July 31, 1975 before the RDA, notice was sent out to the landowners of record affected by the redevelopment plan. The accompanying cover letter stated:

> Since 1971, the Redevelopment Agency of Salt Lake City has been working to improve conditions in the central business district of Salt Lake City. Structurally sound buildings have been renovated while substandard or blighted buildings have been removed to permit new construction necessary for a vital downtown Salt Lake City.
>
> For more than two years, the Agency and the City have explored plans to expand the boundary of the present redevelopment project area to include more of the central business district....
>
> The enclosed Notices describe public hearings to be held by the Redevelopment Agency of Salt Lake City and by the Salt Lake City Commission to consid-

er amending and updating the present redevelopment plan by expanding the project boundaries as more fully described in the Notices and the enclosed map. As a property owner in the downtown area, we know you have a vital interest in maintaining the quality of this area and we desire to keep you informed of our plans and these future meetings.

Prior to the hearing before the Salt Lake City Commission on September 3, 1975, notice was given, indicating that the purpose of the hearing was to

> consider amending and modifying the redevelopment plan entitled "C.B.D. West Neighborhood Development Program," dated January 15, 1971 and initially adopted by ordinance on February 4, 1971, to expand the project area boundaries, to amend the plan to include the tax increment provisions permitted by Section 11–19–29 Utah Code Annotated 1953, as amended, and to keep the plan current with the existing needs of the community.

Block 57 was included within the specified project area. This notice also stated that

> [p]ersons having objections to the proposed redevelopment plan or who deny the existence of blight in the proposed project area, or the regularity of prior proceedings, may appear at the hearing or may file written objections prior to the hearing with the Salt Lake City Recorder showing cause why the proposed plan should not be adopted.

Following this notification, the RDA and the Salt Lake City Board of Commissioners held hearings to amend the redevelopment plan by increasing the survey area and implementing new taxation provisions. The 1975 plan, as amended, did not schedule any properties for acquisition and clearance in that year, nor did it make any determination of blight or that any "buildings, improvements, or lands [were] detrimental or inimical to the public health, safety, or welfare." Further, it did not

---

**6.** This yearly implementation requirement has been eliminated by the 1983 amendments to the Act.

limit its project area to "detrimental or inimical properties" but, instead, included many of the downtown's major cultural and business properties. Consequently, the 1975 plan did not appear to be the "detailed redevelopment plan" required by Utah Code Ann. § 11–19–12 (1971).

On May 14, 1982, the RDA again notified Landowners of public hearings before the Salt Lake City Council and the RDA regarding implementation of the 1982 redevelopment plan,[7] indicating that Block 57 was included in the proposed project area. The cover letter sent with the notification stated that

[t]he proposed amended C.B.D. Neighborhood Development Plan will include the following assistance for residents of the area: (1) Housing rehabilitation programs available for home improvements and repairs; (2) New construction of additional housing for City residents; (3) Curb, gutter, and sidewalk repair programs where these costs could be shared between the owners and the Agency.

It did not indicate either that Block 57 properties were blighted or that the proposed yearly implementation program would deal with renovation of Block 57 properties. In affidavits, Landowners asserted that they understood this notice to mean that the hearings' only relevance to their properties was a curb, gutter, and sidewalk beautification program for Main, State, and Third South Streets, and that the hearings were concerned only with the concept of area redevelopment rather than the determination that specific properties were blighted. In view of the vague language in the notice, their assertion is valid.

At the 1982 hearings, the RDA and the Salt Lake City Council formally designated additional areas of the central business district as redevelopment survey areas. It also reviewed activities which would take place during the following fiscal year which did not involve Block 57 and did not involve the detailed information regarding blight required for the adoption of a formal plan. On August 9, 1984, without any for-

mal hearings or study as to the blighted condition of Block 57 or any further attempt to comply with the statutorily mandated procedure, the City Council authorized the RDA to acquire Block 57 properties for redevelopment.

In summary, the Salt Lake City Council designated a redevelopment survey area and approved studies to determine whether redevelopment of this area was feasible. It also requested that the RDA select project areas within the survey area and prepare preliminary redevelopment plans for them. However, the RDA apparently determined that the entire survey area was the project area, and, regardless of whether or not the properties involved were "detrimental or inimical to the public health, safety, or welfare," prepared and adopted a preliminary plan in the 1975 and 1982 hearings. It then proceeded, without additional notice, hearings, or studies, to find Block 57 to be a blighted area and to condemn it for redevelopment purposes. The RDA did not present a detailed and specific plan for the redevelopment of Block 57 as required by section 11–19–12. Although some of its actions under its proposed plan were presented in a detailed and specific manner during the various hearings, issues of blight, the necessity of the condemnation of the property, and the relocation of the displaced businesses, which section 11–19–21 requires to be addressed in the detailed plan, were not considered and no evidence was taken. We therefore conclude that the RDA impermissibly combined the first and second steps by failing to designate a project area separate and distinct from the survey area, and then failed to comply with the third step which required it to make a detailed redevelopment plan prior to adopting a redevelopment ordinance. Consequently, the hearings did not address the condition of Landowners' property on Block 57, so Landowners never had the opportunity to object to or dispute these issues prior to the condemnation of their property.

---

**7.** Due to a change in the form of city government, the Salt Lake City Council superseded the

Salt Lake City Commission as the municipal legislative body.

Furthermore, we conclude that, from the 1975 notification letter sent to Landowners, they should have been generally aware that the RDA was engaged in renovating sound buildings and removing blighted buildings within the project area, and that the RDA was interested in expanding the boundaries of the project area. They should also have been aware that the RDA was attempting to include new tax increment provisions in the plan and that interested persons could object to the plan or deny the existence of blight in the proposed project area. Because none of the 1975 notices specifically informed Landowners that their property on Block 57 was considered blighted by the RDA, or that their property would be the subject of specific redevelopment activity under the proposed plan, we conclude that the notices were inadequate to put Landowners on notice that their specific property interests would be affected.

Like the notices preceding the 1975 hearings, the 1982 notices did not clearly inform Landowners that their specific properties were blighted or were to be the subject of redevelopment activity. They were, therefore, similarly constitutionally inadequate.

We conclude that: (1) the RDA failed to follow the statutorily mandated procedure in condemning Landowners' Block 57 property, resulting in its failure to address issues regarding blight in the hearings; and (2) even if the RDA had addressed Block 57 blight issues in its hearings, the notice sent to Landowners was inadequate to inform them that blight issues with respect to Block 57 properties were being considered.

■ If adequate notice and an opportunity to be heard are not given, the proceedings are void and those not properly notified are not bound by the proceedings because the giving of such notice is jurisdictional. *See Murray City Redevelopment,* 598 P.2d at 1346; *see also Cate v. Archon Oil Co.,* 695 P.2d 1352, 1356 (Okla.1985). Therefore, the RDA's proceedings condemning Block 57 properties are void as to Landowners. Thus, the statute of limitations never became applicable to Landowners, and the RDA's argument fails.

## II.  BLIGHT FINDINGS

■ Even though the notice issue is dispositive of this case, we deem it necessary to address the substantive merits of the blight finding issue because it is of wide concern in the application of the Neighborhood Redevelopment Act, it significantly affects the public interest, and is likely to recur in a similar manner. *Wickham v. Fisher,* 629 P.2d 896, 899 (Utah 1981). Courts frequently retain jurisdiction over nondispositive issues where the public interest is involved and where there are "questions of constitutional interpretation, issues as to the validity or construction of a statute, or the propriety of administrative rulings." *McRae v. Jackson,* 526 P.2d 1190, 1191 (Utah 1974).

### A.  Proper Scope of Judicial Review

■ The proper scope of judicial review of a municipal governing body's determination of the existence of blight under the Utah Neighborhood Development Act is that the governing body's blight determination should not be disturbed in the absence of fraud or arbitrary and capricious conduct. *City of Birmingham v. Tutwiler Drug Co.,* 475 So.2d 458, 464–65 (Ala.1985); *City of Phoenix v. Superior Court,* 137 Ariz. 409, 671 P.2d 387, 392 (1983); *Tucson Community Dev. & Design Center, Inc. v. City of Tucson,* 131 Ariz. 454, 641 P.2d 1298, 1303 (1981). The reviewing court's inquiry is, thus, limited to the "record of information presented to the governmental body." *Urban Renewal Agency of City of Reno v. Iacometti,* 79 Nev. 113, 379 P.2d 466, 468 (1963). "If the evidence is such that the city could reasonably have found ... a condition of blight, the resolution is not arbitrary." *Tucson Community Dev.,* 641 P.2d at 1303; *see also City of Phoenix,* 671 P.2d at 392; *Apostle v. City of Seattle,* 70 Wash.2d 59, 422 P.2d 289, 292 (1966).

### B.  Evidence Required To Support Finding Of Blight

■ The Utah Neighborhood Development Act requires the redevelopment agency and the municipal legislative body to

conduct public hearings in preparing a redevelopment plan for each project area. Utah Code Ann. § 11–19–12 and –15 (1971). Persons "who deny the existence of blight in the proposed project area" may appear before the legislative body during the public hearing. Utah Code Ann. § 11–19–16 (1971). In adopting an ordinance enacting a redevelopment plan, the legislative body must make findings and determinations "based upon fact" that, among other things, "the project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this act." Utah Code Ann. § 11–19–21 (1971). Thus, for an urban renewal plan to be effective, the statutorily required findings must be made. *See East Grand County School Dist. No. 2 v. Town of Winter Park*, 739 P.2d 862, 865–66 (Colo. Ct.App.1987). "To hold otherwise would circumvent the legislative intent underlying the statutory requirement for the specified findings." *Id.* at 866.

■ From the statutory language, we also conclude that the existence of blight is a factual issue which must be determined on the basis of an evidentiary hearing. *See Salt Lake County v. Murray City Redevelopment*, 598 P.2d 1339, 1346 (Utah 1979). The Utah Supreme Court has found that "[t]he failure to have an evidentiary hearing on factual matters concerning the issue of blight, notwithstanding motions by both parties contending that there were no factual matters left for resolution, was error." *Murray City Redevelopment*, 598 P.2d at 1346. Therefore, we hold that, to enact a redevelopment plan under the

Neighborhood Development Act, the legislative body must make a finding that the project area is a blighted area based upon evidence and following an evidentiary hearing.[8]

■ Such findings must be supported by sufficient evidence. For evidence to be sufficient, "some facts must be found which indicate that the Council knows what constitutes 'blight,' and which support the ultimate finding that the area is blighted...." *Apostle*, 422 P.2d at 292. Further, the findings "must be sufficiently specific so that anyone reading them can determine what evidence in the record led to the Council's determination that the area was 'blighted.'" *Id.; see also Fosselman's, Inc. v. City of Alhambra*, 178 Cal. App.3d 806, 224 Cal.Rptr. 361, 363–65 (1986).

■ The RDA argues that the Utah Neighborhood Development Act does not require it to undertake blight analysis on individual properties, but allows it to examine the overall condition of a limited geographical area in determining the existence of blight. The RDA reasons that this "area concept" is in harmony with the intent of the Act and consistent with the entire concept of urban renewal. Landowners, however, argue that the legislature rejected an area-wide redevelopment concept, and, consequently, that the Act requires a property-by-property finding of blight before the RDA can acquire property for redevelopment. Therefore, they maintain that the RDA may not condemn

---

8. The Arizona Supreme Court has, in contrast, held that the legislative body need not "receive evidence of blight before it can lawfully adopt a resolution declaring a certain area to be blighted." *Tucson Community Dev.*, 641 P.2d at 1304. This interpretation, however, is not applicable to our Act because it is based upon the reasoning that nothing in the Arizona Slum Clearance and Redevelopment Act required the mayor and council to hold a hearing or receive evidence at the time they made the blight finding. *Id.* at 1303; *see also City of Phoenix v. Superior Court*, 137 Ariz. 409, 671 P.2d 387, 388 (1983). We note that the Arizona statute in question, A.R.S. § 36–1473 (1982) is substantially different from our statutory scheme, providing only that:

No municipality shall exercise any of the powers conferred upon municipalities by this article until its local governing body adopts a resolution finding that:
 1. One or more slum or blighted areas exist in the municipality, and
 2. The redevelopment of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents of the municipality.
*Id.* A subsequent revision of the Arizona statute provides for public hearings. *Id.* The negative implication of the Arizona court's interpretation of this statute is that if hearings are required, as they are under the Utah statute, then evidence must be taken to support the required factual findings.

unblighted property just because it is in a larger area, only part of which may be blighted.

In interpreting a statute, we "look to the plain meaning of the language at issue to discern the legislative intent." *Chris & Dick's Lumber and Hardware v. Tax Comm'n,* 791 P.2d 511, 514 (Utah 1990). Under Utah Code Ann. § 11–19–21 (1971), to adopt a redevelopment ordinance, the legislative body must find, among other things, that "(a) the project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this act," and "(f) the condemnation of real property, if provided for in the redevelopment plan, is necessary to the execution of the redevelopment plan...." The Act does not specifically state that the RDA must find blight on an individual building-by-building basis, but simply states that the legislative body must find that the area is "blighted."

To find that an area is "blighted," the legislative body must consider the factors set forth in Utah Code Ann. § 11–19–2(10) (1971). A "blighted area" is

characterized by the existence of buildings and structures ... which are unsafe to occupy ... or are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors:

(a) Defective design and character of physical construction,

(b) Faulty interior arrangement and exterior spacing,

(c) High density of population and overcrowding,

(d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities,

(e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses,

(f) Economic dislocation, deterioration or disuse, resulting from faulty planning,

(g) Subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development,

(h) Laying out of lots in disregard of the contours and other physical characteristics of the ground and surrounding conditions,

(i) Existence of inadequate streets, open spaces, and utilities, and

(j) Existence of lots or other areas which are subject to being submerged by water.

These factors require that the legislative body consider evidence as to the physical condition, design, and layout of specific, individual buildings and structures. It also requires the legislative body to consider evidence as to the character, not only of individual buildings, but the areas in which the buildings are located, including the lot layout, economic use or disuse, deterioration, design, and population density of the area. Thus, we conclude that the statutory wording provides for the municipal legislative body to look at evidence both as to individual buildings and the entire proposed project area in making a blight finding. The pivotal ultimate finding, however, is whether a project area, not individual buildings in it, is blighted.

Landowners base their argument upon the legislative history of Utah Code Ann. § 11–15–39 (1965), a provision of the Utah Community Redevelopment Act identical to section 11–19–9 of the later-enacted Utah Neighborhood Development Act. Landowners indicate that section 11–15–39, as originally introduced as Senate Bill 31, stated that

[a] project area need not be restricted to buildings, improvements or lands which are detrimental or inimical to the public health, safety or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area. A project area may include lands, buildings or improvements which are not detrimental to the public health, safety or welfare, but whose inclusion is found necessary for the effective redevelopment of the area of which they are a part.

Senate Bill 31 was subsequently amended, prior to the enactment of the Utah Neighborhood Development Act, to read as follows: "A project area must be restricted to buildings, improvements, or lands which are detrimental or inimical to the public health, safety, or welfare." Landowners argue that the amendment indicated the project area must be restricted to "detrimental or inimical" properties, rather than allowing nondetrimental properties to be included. Subsequently, the Utah Neighborhood Development Act was enacted, including section 11–19–9, which contains language identical to the amended section 11–15–39. Landowners, therefore, assert that "[t]he rejection by the Utah legislature of the area-wide concept of development advanced by the RDA could not be clearer," and, therefore, the RDA could not condemn nonblighted property within the project area.

We disagree with Landowners' assertion on the ground that such a construction of the statute would do violence to the purpose of the Act.

Utah Code Ann. § 11–19–2(11) (1971) defines a project area as "an area of a community which is a blighted area within a designated redevelopment survey area, the redevelopment of which is necessary to effectuate the public purposes declared in this act, and which is selected by the redevelopment agency pursuant to this chapter." Under Utah Code Ann. § 11–19–9 (1971), however, a project area is restricted to "buildings, improvements, or lands which are *detrimental or inimical* to the public health, safety, or welfare." (Emphasis added.) The issues thus become whether an "inimical" area is the same as a "blighted area", and whether a "blighted" area can contain individual, unblighted properties.

As a general rule, we interpret parts of an act to "harmonize with the purpose of the whole act." *Utah Power & Light Co. v. Utah Assoc'd Mun. Power Systems,* 784 P.2d 137, 140 (Utah 1989); *see also Ward v. Richfield City,* 776 P.2d 93, 97 (Utah Ct. App.1989). Thus,

a statute should be construed as a whole, and its terms should be construed to be harmonious with each other and the overall objective of the statute. In determining the legislative intent of a statute, the statute should be considered in the light of the purpose it was designed to serve and so applied as to carry out that purpose if that can be done consistent with its language.

*Utah Power & Light Co.,* 784 P.2d at 140–41 (quoting *Utah State Road Comm'n v. Friberg,* 687 P.2d 821, 831 (Utah 1984) and *Johnson v. State Tax Comm'n,* 17 Utah 2d 337, 411 P.2d 831, 832 (1966)).

We ascertain the purpose of this Act from a reading of the definition of "redevelopment":

"Redevelopment" means the planning, development, replanning, redesign, clearance, reconstruction, or rehabilitation, or any combination of these, of all or part of a project area, and the provision of such residential, commercial, industrial, public, or other structures or spaces as may be appropriate or necessary in the interest of the general welfare, including recreational and other facilities incidental or appurtenant to them. Redevelopment includes:

(a) The alteration, improvement, modernization, reconstruction, or rehabilitation, or any combination of these, of existing structures in a project area;

(b) Provision for open space types of use, such as streets and other public grounds and space around buildings, and public or private buildings, structures and improvements, and improvements of public or private recreation areas and other public grounds;

(c) The replanning or redesign or original development of undeveloped areas as to which either of the following conditions exist:

1. The *areas* are stagnant or improperly utilized because of defective or inadequate street layout, faulty lot layout in relation to size, shape, accessibility, or usefulness, or for other causes; or

2. *The areas require replanning and land assembly for reclamation or development in the interest of the general welfare.* Redevelopment shall include and encourage the continuance of existing buildings or uses whose demolition and rebuilding or change of use are not deemed essential to the development, redevelopment or rehabilitation of the area.

Utah Code Ann. § 11–19–2(9) (1971) (emphasis added). The language of this section indicates that the purposes of this Act include not only continuing, improving or rebuilding existing, nonblighted buildings, providing their demolition is not deemed essential to the project, but also improving, rebuilding, replanning, and redesigning entire project areas in the interest of the general welfare. If we were to construe section 11–19–9 as Landowners suggest, allowing only building-by-building redevelopment, we would do violence to this purpose of the Act.

Further, it is generally presumed that the terms of a statute are used advisedly by the legislature, so

effect should be given to each such word, phrase, clause, and sentence where reasonably possible. In the process of interpretation, courts may not take, strike, or read anything out of a statute or delete, subtract, or omit anything therefrom. The only exception to the latter rule is when the words of a statute are so meaningless or inconsistent with the intention of the legislature otherwise plainly expressed in the statute that they may be rejected as surplusage and omitted, eliminated, or disregarded ... The court will not construe a particular provision of a statute so as to neutralize or modify other provisions if any other construction of the particular provision is at all tenable.

*Chris & Dick's*, 791 P.2d at 516 (citations omitted) (Howe, J., dissenting); *see also McBride v. Carter*, 784 P.2d 141, 142 (Utah 1989); *Pate v. Marathon Steel Co.*, 777 P.2d 428, 430 (Utah 1989)

The definition of "blighted area," as set forth in section 11–19–2(11), uses factors which apply not only to individual buildings, but to areas as a whole. While "[d]efective design and character of physical construction" and "[f]aulty interior arrangement and exterior spacing" are clearly factors that usually apply to individual buildings, "[i]nadequate provision for ... open spaces and recreation facilities," "[s]ubdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development," and "[e]xistence of inadequate streets, open spaces, and utilities" are clearly factors which may go to an area as a whole and may encompass more than one lot or structure. Construing section 11–19–9 to preclude area development would not only do violence to the plain meaning of the words, *see Chris & Dick's*, 791 P.2d at 516, it would also eviscerate the whole purpose of the Act and would place in conflict the very factors that determine blight, making some of the terms of the statute void and meaningless.

Finally, even the language of section 11–19–9 lends itself to an interpretation allowing for the area redevelopment in that it specifies the project area be restricted not only to buildings or improvements, but to "lands" which are "detrimental or inimical to the public health, safety, or welfare."

■ To give a harmonious meaning to section 11–19–9, we reject Landowners' argument that the legislature has rejected an "area concept" of redevelopment, thus requiring a property-by-property determination of "blight" and disallowing the condemnation of any unblighted property in a project area. Instead, we find that the RDA may condemn even nonblighted individual properties within a project area, so long as the project area as a whole has a negative impact upon the public interest as defined in the Act. Thus, we disagree with the trial court's conclusion that every piece of property within the project area must be found to be blighted before the area can be redeveloped.

■ We conclude that a blight study should take into account both the conditions of individual buildings within a project area and the general character of

the area. The legislative body may then make a finding of area blight based upon this study. If it finds that the project area, taken as a whole, is detrimental or inimical to the public health, safety, or welfare, even if some buildings, structures, or lands within it are not blighted, it may condemn the entire project area. It must, however, leave out of the project area those areas which, taken as a whole, are not "detrimental or inimical." "If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly...." *City of Phoenix,* 671 P.2d at 393 (quoting *Berman v. Parker,* 348 U.S. 26, 35, 75 S.Ct. 98, 104, 99 L.Ed. 27 (1954); *Apostle,* 422 P.2d at 293 (the presence of well constructed and properly maintained properties did not prevent an area from being found to be blighted); *City of Birmingham,* 475 So.2d at 468.

■ In April 1975, the Salt Lake City Planning Department, in response to a request by the RDA, conducted a building survey of the original thirteen-and-one-half block survey area. This survey evaluated each building in terms of its foundation, exterior walls, windows, doors, stairways, and trim features. It also looked at sidewalks, curbs and gutters, and streets, and identified lots without structures. It classified buildings as satisfactory, requiring minor repair, requiring major repair, and beyond repair. The survey identified twenty-eight percent of the buildings within the survey area as beyond repair, forty-three percent as requiring rehabilitation, and the remainder as either requiring minor repair or as satisfactory. Block 57 was included in this survey. This survey did not conclude that any specific properties or areas were blighted, including Block 57.

During the July 31, 1975 hearing before the RDA, Chitwood presented a map showing the existing structural conditions of the buildings based upon this study. The map graded the structural condition of the buildings into four grades: sound, requiring minor rehabilitation, requiring major

rehabilitation, and beyond repair. Although Block 57 was included on this map, the record does not indicate the specific condition of Block 57. Regarding this map, Chitwood stated that "based on this map here ... we consider the [entire thirteen-and-one-half block] area eligible for a redevelopment treatment," and indicated that the map was the "best opinion of the members of the Planning Department staff as to what is presently there in a structural sense." Chitwood did not present the map during this hearing, however, for the purposes of showing area-wide blight or condemning property, but only for the purpose of discussing the issue of tax increment planning.

At the hearings held on June 3 and 4, 1982, the RDA presented its redevelopment plan. This plan included, as its "project area," the entire expanded twenty-six-and-one-half block survey area without any limitation as to whether particular areas thereof were blighted or "detrimental." Neither the RDA nor the Salt Lake City Council received evidence, nor did they find that any properties or particular areas, including those on Block 57, were blighted, or detrimental or inimical to the public health, safety, or welfare. Nevertheless, the RDA's report issued following these hearings made the following blight findings:

The physical characteristics of the C.B.D. Neighborhood Development Plan area may generally be classified into three groups. The first group is that area where no rehabilitation or redevelopment has occurred since original construction, thereby including the greatest incidents of blight. The second group is that area which is described as having recently been developed or redeveloped by private or public redevelopment projects such as that in Block 58, 69, 75 & 76. The third area is that whereby the physical characteristics include a mixture of new construction, blighted property, or that already rehabilitated or refurbished.

The physical conditions in the project area were found to have various evidences of blight due primarily to obso-

lescence and neglect. Some of the structures appear to have outlived their usefulness and are in an advanced stage of dilapidation. Other structures have undergone recent remodeling; however, the original building shell reveals signs of both exterior and interior deficiencies incident to age and defective design character. Many of the existing structures would not presently meet the seismic code qualifications according to the Uniform Building Code and that to do so would not be economically feasible for any of the buildings.

.    .    .    .    .

A major economic dislocation occurred in the Southern end of the C.B.D. area on Broadway between Main Street and State Street [the southern side of Block 57]. This economic loss is symptomatic of the polarization of new retail facilities in the Northern part of the C.B.D. The proposed redevelopment plan addresses the regeneration of the Southern and Western portions of the C.B.D. project area.

Based upon these subsidiary findings, including the finding that the properties on the south of Block 57 were the victims of a major economic dislocation, the City Council found that

[t]he project area comprising the major portion of the central business district of Salt Lake City as above described is a "blighted area" as defined in Section 11–19–3, Utah Code Annotated 1953, as amended, and that the redevelopment of said area is necessary to effectuate the public purposes set forth in the Utah Neighborhood Development Act and public purposes intended by the establishment of the Redevelopment Agency of Salt Lake City.

Nonetheless, at a meeting of the RDA on June 2, 1983, Chitwood discussed a proposed $130,000 allotment for a blight study of Block 57, an exercise that would be unnecessary if the RDA were entirely comfortable with the findings adopted by the City Council that the entire large area, of which Block 57 was a part, was blighted. He stated that the RDA would do a complete, building-by-building, structural survey of all the structures on the Block for the purpose of proving blight, and then would schedule all unrepairable buildings for demolition. In response to Commissioner Davis's objection to the expense of the study, in which she asked whether the RDA could pull the information it needed from previous studies of the area, Chitwood stated that "those studies were done over two years ago and now the block [is] totally different."

At the February 9, 1984 meeting of the RDA, while again discussing the possibility of doing a blight study on Block 57, Chitwood stated that "[B]lock 57 is so obviously blighted we feel that we would rather see that money·spent on an Economic Base study." The RDA, as a consequence, never ran a blight study on Block 57. In his deposition taken prior to trial, Chitwood admitted that no hearings were conducted specifically on the issue of blight on Block 57, and that the only applicable survey or study involving Block 57 was the 1975 structural survey and the resulting map. This map and survey, which constituted the only evidence on the record going to blight on Block 57, was not a blight study but did address several of the blight factors set forth in section 11–19–2(10), the exterior and interior conditions of individual buildings, the lot layout, and the street conditions. Because section 11–19–2(10) requires only that the legislative body examine one or any combination of these factors, this study may have been sufficient to support a blight finding had it been used for this purpose in 1975. However, by Chitwood's own admission, the study was too old in 1982 to be of any use in addressing the condition of Block 57. He stated that even two-year-old studies were too old to use for this purpose because of significant changes which had occurred on the Block. In 1982, the 1975 survey was seven years old, making it even more out of date and irrelevant.

No other evidence as to blight on Block 57 was taken on the record during the 1982 hearings. As a consequence, we cannot ascertain what evidence, if any, was used

by the RDA to arrive at its specific findings, including its finding that the southern portion of Block 57 suffered from economic dislocation. Because the Salt Lake City Commission's blight findings are evidently based upon the RDA's findings, we must also conclude that there is no ascertainable evidence supporting them. We conclude, from this record, that the Salt Lake City Council could not have reasonably concluded that Block 57, itself, was blighted or that it comprised an integral part of a discrete area that was blighted and, therefore, it acted arbitrarily and capriciously in so finding.

In sum, the trial court concluded (1) that the notice given by the RDA to the Landowners that their property could be acquired for redevelopment purposes was constitutionally inadequate, and (2) that § 11–19–9 of the Utah Neighborhood Development Act requires the RDA to determine that each piece of property is blighted and detrimental or inimical to the public health, safety, or welfare before it can acquire the property. We affirm the trial court's decision that notice was insufficient and that the RDA failed to follow statutory procedures in condemning Landowners' property. However, insofar as the trial court deemed it necessary to reach the issue of blight, and then conclude that the Act requires that each piece of property in a project area must be found to be blighted, we disagree, and therefore reverse this part of the trial court's declaratory judgment.

Affirmed.

ORME, J., concurs.

JACKSON, Judge (concurring and dissenting):

I concur with part I of the majority opinion, which concludes that the trial court correctly ruled that the procedure used by the RDA was fatally flawed.

I dissent from the "blight findings" analysis in part II. The majority reverses the trial court's declaratory judgment interpreting the Utah Neighborhood Development Act, but I would affirm. The majority's attempt to harmonize the statutory provisions runs counter to the legislature's deliberate insertion of a mandatory restriction on project areas. That restriction specifically made our statute the opposite of other states' statutes. The restriction was designed to protect private property rights from sweeping determinations by redevelopment officials. ·

Appellees sued for declaratory judgments on three causes of action pursuant to our declaratory judgments statute, Utah Code Ann. § 78–33–2 (1987). Each cause of action requested declarations construing the provisions of the Utah Neighborhood Development Act, Utah Code Ann. §§ 11–19–1 to –35 (1986). The trial court was asked to determine the proper meaning and application in this controversy of the terms "blight," "project area," and "detrimental or inimical to the public health, safety or welfare," as used in the Act.

The trial court entered the following ten conclusions of law, among others, in support of its declaratory judgment:

1. The statute under which the RDA is proceeding in this litigation and attempting to acquire and redevelop the plaintiffs' property is the 1969 Utah Neighborhood Development Act, §§ 11–19–1, et seq., Utah Code Ann. (1953), as amended.

2. The 1969 Utah Neighborhood Development Act was preceded by the 1965 Utah Community Redevelopment Act, §§ 11–15–1, et seq.

3. Section 39 of the 1965 Utah Community Redevelopment Act is identical to Section 9 of the 1969 Utah Neighborhood Development Act.

4. The legislative intent and policy revealed in the legislative history of Section 39 of the 1965 Utah Community Redevelopment Act is embodied in the identical provision of Section 9 of the 1969 Utah Neighborhood Development Act.

5. The legislative history of the 1965 Community Redevelopment Act clearly reflects that that Act was originally proposed in the Utah Senate as Senate Bill 31. Section 39 of Senate Bill 31

was word-for-word taken from and identical [to] the California Redevelopment Statute 33000 et *seq.*, West's Cal. Ann.Code. Section 39 of Senate Bill 31 followed the dictates of Section 33321 of the California statute in providing: A project area *need not* be restricted to buildings, improvements or lands which are detrimental or inimical to public health, safety or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area. *A project area may include lands, buildings or improvements which are not detrimental* to the public health, safety or welfare, but whose inclusion is found necessary for the effective redevelopment of the area of which they are a part. (Emphasis added.)

6.  The 1965 House Journal, 36th Session, reveals that the House of Representatives made two significant amendments to Section 39 of Senate Bill 31 as originally introduced. According to the House Journal, in the first line after the word "area," the words "need not" were deleted, and the word "must" was inserted. That same sentence was also amended to insert a period after the word "welfare" and the entire balance of the Section was deleted. Section 39 of Senate Bill 31, as amended, then read as follows:

    A project area must [~~need not~~] be restricted to buildings, improvements or lands which are detrimental or inimical to the public health, safety or welfare. [~~but may consist of an area in which such conditions predominate and injuriously effect the entire area. A project area may include lands, buildings, or improvements which are not detrimental to public health, safety or welfare, but whose inclusion is found necessary for effective redevelopment of the area of which they are a part.~~]

7.  The "area-wide" concept argued by the RDA was specifically rejected by the Utah legislature as underscored in the compelling legislative history. Instead, the legislature adopted a provision which limits a "project area" to buildings, lands or improvements which are detrimental or inimical to the public health, safety and welfare. The rejection by the Utah legislature of a specific provision contained in the 1965 Utah Community Redevelopment Act and re-enacted in the 1969 Utah Neighborhood Development Act is highly persuasive as a matter of law, consistent with controlling law, and warrants the conclusion that the 1969 Utah Neighborhood Development Act should not be construed to adopt or incorporate the "area-wide" concept.

8.  Under § 11–19–9 of the Utah Neighborhood Development Act, the Agency, incident to a determination of blight, must resolve that every property included within a redevelopment project area be detrimental or inimical to the public health, safety or welfare[;] § 11–19–2(10) and (11) of the Utah Neighborhood Development Act require that the Agency determine that the "project area" is a "blighted area".

9.  The RDA has failed to cite to the Court any authorities and court decisions to support its position of an "area-wide" application of the Utah Act where the statute being enforced is similar to Utah. The legal authorities cited by the RDA to support its claim that there are no state and federal constitutional barriers to redevelopment on an "area-wide" basis do not have application to the Utah Neighborhood Development Act and the provisions set forth in § 11–19–9.

10. It is within the clear legislative prerogative to restrict redevelopment to specific buildings, lands or improvements which meet the test set by the legislature in this case to properties which are "detrimental or inimical to the public health, safety and welfare." Once the legislature has established the guidelines and limits to the implementation of a redevelopment plan for the acquisition and redevelopment of private properties, the RDA must then strictly comply with the requirements

of the enabling legislation, including § 11–19–9.

Since I agree with the foregoing conclusions of law, I would affirm the trial court's declaratory judgment interpreting the Act.